Gwendolyn L. GREGORY, as Executrix under the Will of Joseph Morgan Gregory, Deceased, Plaintiffs,

v.

The GARRETT CORPORATION; Colt Electronics Co., Inc.; Phoenix Aerospace, Inc.; and Lockheed Corp., Defendants.

The GARRETT CORPORATION and Lockheed Corporation, Third-Party Plaintiffs,

v.

TEXASGULF, INC. and Texasgulf Aviation, Inc., Third-Party Defendants.

and Related Actions.

Nos. 82 Civ. 2316 (GLG), 82 Civ. 3045 (GLG), 82 Civ. 3911 (GLG), 82 Civ. 3912 (GLG), 82 Civ. 3913 (GLG), 82 Civ. 5278 (GLG), 82 Civ. 6297 (GLG), 82 Civ. 6459 (GLG), 82 Civ. 1042 (GLG) and 83 Civ. 1082 (GLG) to 83 Civ. 1084 (GLG).

United States District Court, S.D. New York.

June 1, 1984.

See also 578 F.Supp. 871 and 890.

Whitman & Ransom, New York City, for plaintiffs Gwendolyn L. Gregory, Mary V. Drew, and Mary L. McKee; Kevin Keating, Richard E. Lawler, New York City, of counsel.

Kreindler & Kreindler, New York City, for plaintiffs Morgan Guaranty (Fogarty), Woodling, and Claydon; Milton G. Sincoff, Steven Earl Anderson, New York City, of counsel.

Speiser & Krause, P.C., New York City, for plaintiff Constance A. Boyle; Frank H. Granito, Jr., New York City, of counsel.

Cummings & Lockwood, Stamford, Conn., for plaintiff Judith N. Sorenson Ten Stamford Forum; Mark E. Fuhrmann, Stamford, Conn., of counsel.

Costello & Shea, New York City, and Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for defendant and third-party plaintiff The Garrett Corp.; J. Donald Tierney, New York City, Keith Gerrard, Richard C. Coyle, Sherilyn Peterson, Seattle, Wash., of counsel.

Lester, Schwab, Katx & Dwyer, New York City, and Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for defendant and third-party plaintiff Colt Electronics Co., Inc.; B. Jennifer Jaffee, New York City and Timothy W. Triplett, Kansas City, Mo., of counsel.

Donovan, Leisure, Newton & Irvine, New York City, and Morris, Larson, King, Stamper & Bold, Kansas City, Mo., for defendant and third-party plaintiff Phoenix Aerospace, Inc.; Daniel R. Murdock, New York City and Steven G. Emerson, Kansas City, Mo., of counsel.

Mendes & Mount, New York City, for defendant and third-party plaintiff Lockheed Corp.; Kevin F. Cook, James W. Hunt, James M. Fitzsimons, New York City, of counsel.

John S. Martin, Jr., U.S. Atty., New York City, J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., for defendant U.S.A.; Kathlynn G. Fadely, Susan M.H. Gillett, Trial Attys., Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., of counsel.

Townley & Updike, New York City, for defendants and third-party defendants TexasGulf Inc. and TexasGulf Aviation Inc.; Frederick D. Berkon, John C. Sabetta, Michael Belohlavek, New York City, of counsel.

## MEMORANDUM DECISION AND ORDER

GOETTEL, District Judge.

In most of the twenty-one related actions arising out of the crash of Texasgulf Aviation, Inc.'s ("TGA's") Lockheed Jetstar near Westchester airport on February 11, 1981, TGA and its parent, Texasgulf, Inc. ("Texasgulf"), as defendants or third-party defendants,[1] asserted two affirmative defenses against the claims brought by the estates of the six passengers and two crew members who died in the crash. The first defense was that of employer's immunity from suit under the pertinent workers' compensation laws, and the second defense was that of release from any potential tort liability or liability for contribution to other defendants.[2]

When Texasgulf and TGA moved for summary judgment based on these two affirmative defenses, the Court denied both motions, primarily on the ground that material issues of fact remained to be litigated. Thereafter, Texasgulf and TGA moved for a bifurcated trial, with the affirmative defenses to be tried first and the issues of liability and damages to be tried later. That application was granted and the two defenses were tried to a jury during the month of April.

During their deliberations the jury considered the following special interrogatories and gave the following answers:

Q.1. Do you find: that at the time of the crash Texasgulf Aviation functioned solely as the aviation department of Texasgulf; that Texasgulf and Texasgulf Aviation were so merged that they were really only one entity; that Texasgulf Aviation had no purpose other than to carry out Texasgulf's business; *and* that Texasgulf Aviation's corporate structure and any right it had to control the flight crews and maintenance personnel were so merged with those of Texasgulf that for purposes of determining the scope of workers' compensation immunity Texasgulf Aviation should be considered the alter ego of Texasgulf rather than a separate corporate entity?

A. No.

Q.2. Who was the employer of the flight crew and the maintenance personnel for the aircraft that crashed?

A. Texasgulf Aviation.

Q.3. Who was the operator of the aircraft that crashed?

A. Texasgulf Aviation.

Q.4. In communicating with the estate representatives regarding the relationship between Texasgulf and Texasgulf Aviation or regarding the workers' compensation immunity defense, did Texasgulf or USAIG make any fraudulent misrepresentation *or* any material misrepresentation which was justifiably relied upon by the estate representatives while they were making their decision to sign the releases?

A. Yes.

Q.5. In communicating or not communicating with the estate representatives regarding the existence of the American Home Insurance policy and the nature of its coverage, did Texasgulf

---

1. In one of these actions, *Texasgulf, Inc. v. Colt Electronics, Co.,* No. 81–7147 (S.D.N.Y. filed Nov. 17, 1981) (commonly referred to as the "hull action"), Texasgulf and TGA are plaintiffs seeking recovery for the loss of the aircraft.

2. Releases were signed by only six of the eight estates, each of which received $250,000 in return.

or USAIG make any fraudulent misrepresentation *or* any material misrepresentation which was justifiably relied upon by the estate representatives while they were making their decision to sign the releases?

A. Yes.

Q.6. Did Texasgulf or USAIG, in their dealings with any of the estate representatives in connection with the releases, make any fraudulent misrepresentation *or* any material misrepresentation which the estate representatives justifiably relied upon in making their decisions to sign the releases?

A. Yes.

With respect to Questions 4, 5, and 6, the jury also indicated that each estate representative who had signed a release had relied upon the misrepresentations.[3]

After the jury returned its verdict, counsel for Texasgulf and TGA stated that they would move within ten days to set aside the jury verdict. They also argued that, if the jury verdict were not set aside, the Court should order each estate that had received $250,000 in exchange for signing a release to return the full amount of the consideration. The Court has since received complete papers only on the question of the return of consideration; thus, in this decision only that question is considered.

Texasgulf and TGA argue that each estate is required by law, equity, and contractual obligation to return $250,000, because the release that was signed as a condition

precedent to the receipt of the money is a "nullity." Texasgulf and TGA's Post Trial Memorandum of Law at 12 n. *. In response, the estates make a number of points. One of these is that a return of consideration is required only upon entry of a final judgment and that no final judgment can be entered at this time because no claim has been fully adjudicated. The estates add that even if judgment were proper, a stay of execution of such judgment would be appropriate because the estates have claims against Texasgulf and TGA which will probably result in an even larger recovery than $250,000 per estate.

DISCUSSION

■ The parties spend considerable time debating which state's law should be applied to these issues. However, the Court has already determined during trial that New York law should apply to procedural issues even though some aspects of the releases' validity might have to be considered under the laws of other states.[4] So too, New York law applies here to the question of whether the estates must return the consideration before the issues of liability and damages are tried.[5] *See, e.g.,* *Ciletti v. Union Pac. R. Co.,* 196 F.2d 50, 51 (2d Cir.1952).

■ Section 3004 of New York's Civil Practice Law provides that one seeking rescision of a contract (or opposing a defense of release) need not offer to restore benefits received pursuant to the contract when bringing an action thereon and that the

---

**3.** Question number 5 did not address the estates of the two crew members, however, because the American Home Insurance policy explicitly excluded coverage of any crew members.

**4.** Some of the releases state that they are to be governed by the law of Connecticut, some by North Carolina law, and one by New York law.

**5.** Moreover, although the estates cite some North Carolina and Connecticut cases with general language to the effect that consideration paid for a release can merely be credited against any damages awarded in a final judgment on the underlying tort claim, *e.g., King v. Atlantic Coast Line R. Co.,* 157 N.C. 44, 72 S.E. 801, 809–10 (1911); *Mandeville v. Jacobson,* 122 Conn. 429, 189 A. 596, 598 (1937), none of those cases involved a situation such as this one,

where the rescission issue has been tried and adjudicated prior to the trial of the tort claim. Indeed, cases cited by Texasgulf and TGA, which are more directly on point and more recent, suggest that the law in both North Carolina and Connecticut is that the party pleading rescission must, as a condition precedent to bringing such an action, tender the return of whatever consideration has been received in exchange for the release in question. *E.g., Davis v. Hargett,* 244 N.C. 157, 161, 92 S.E.2d 782, 785 (1956); *Keyes v. Brown,* 155 Conn. 469, 476, 232 A.2d 486, 490 (1967). Thus, it appears that even if the law of North Carolina and Connecticut were applied, this Court's decision on this issue would be the same.

claimant will not be denied relief because of a failure to make such an offer before a judgment is entered. N.Y.Civ.Prac. Law § 3004 (McKinney 1974).[6] However, the section goes on to provide that "the court may make a tender of restoration a condition of its judgment, and may otherwise in its judgment so adjust the equities between the parties that unjust enrichment is avoided." *Id.*[7] *Thus, it is clear that although section 3004 of New York's Civil Practice Law does not require a tender of restoration as a prerequisite to a rescission action, it does give the Court the discretion to order such a tender to prevent unjust enrichment.*[8]

■ Despite the clear language of the statute to the contrary, the estates seem to cite *Skipworth v. Cooper,* 37 A.D.2d 906, 325 N.Y.S.2d 485 (4th Dep't 1971), for the proposition that a Court may in no circumstances require a plaintiff to tender restoration of consideration before judgment is entered on the merits of the underlying tort claim. That, however, reads an awful lot into a brief memorandum decision of only two paragraphs,[9] and the Court is unwilling to construe the word "judgment" in section 3004 as meaning only a final money judgment ultimately disposing of all issues in the case. Indeed, under New York practice, where interlocutory appeals are freely allowed, such a construction would be an anomaly. Rather, the "judgment" contemplated is one that determines whether the releases in question are voidable—a decision already made by the jury herein. Although the considerations would

6. Section 3004 reads in its entirety:

A party who has received benefits by reason of a transaction that is void or voidable because of fraud, misrepresentation, mistake, duress, infancy or incompetency, and who, in an action or by way of defense or counterclaim, seeks rescission, restitution, a declaration or judgment that such transaction is void, or other relief, whether formerly denominated legal or equitable, dependent upon a determination that such transaction was void or voidable, shall not be denied relief because of a failure to tender before judgment restoration of such benefits; but the court may make a tender of restoration a condition of its judgment, and may otherwise in its judgment so adjust the equities between the parties that unjust enrichment is avoided.

N.Y.Civ.Prac. Law § 3004 (McKinney 1974).

7. In this regard, it is interesting to note that none of the estates that signed a release has sought rescission thereof. Indeed, even the two estates that commenced direct actions against TGA after learning of the possible grounds for rescission made no reference in their complaints to the existence of the releases. By so doing, the estates apparently hoped to put themselves in a position where the rescission and liability issues would be tried jointly, which would have afforded the estates numerous benefits (which, taken together, might best be characterized as "having your cake and eating it too"). However, the separate trial of the release and workers' compensation issues has dashed those hopes.

8. In the legislative history concerning the passage of section 3004, the New York Law Revision Commission noted:

The Commission believes that the distinction between fraud in the inducement and fraud in the execution, whatever its validity for other legal consequences, should have no significance with respect to the requirement of restoration of benefits received by a defrauded party. That requirement depends upon the principle that even a defrauded party would be unjustly enriched if he were allowed to keep what he received for signing an instrument and yet treat it as a nullity with respect to adverse consequences it might have as to him.

Report of the Law Revision Commission for 1952, at 343–44 (1952).

9. The opinion, in its entirety, states only the following:

The finding that the release was the product of misrepresentation is supported by the evidence. Repayment by plaintiff to defendant or his insurance company of the amount received by him from defendant on giving the release is not a prerequisite to maintaining this action (see CPLR 3004; *Marr v. Tumulty,* 256 N.Y. 15, 21, 175 N.E. 356, 357 et seq.; 3 Weinstein-Korn-Miller, N.Y.Civ.Prac., ¶¶ 3004.01–3004.06). In *Marr,* at page 22, 175 N.E. at page 358, the court said, "Suitable conditions may be imposed by the decree". The ultimate rights of the defendant with respect to the payment he made for the release are fully and properly protected by the order appealed from and the parties will be bound thereby upon entry of the judgment after the determination of the merits of plaintiff's action. This accords with established practice (*Finke v. Iris Cab Corp.,* 1 A.D.2d 692, 147 N.Y.S.2d 548).

*Skipworth v. Cooper,* 37 A.D.2d 906, 325 N.Y.S.2d 485 (4th Dep't 1971).

perhaps be different in the case of a concurrent verdict on both the validity of the releases and the tort liability of each party, here, where there has been a preliminary determination of the invalidity of the releases before liability is tried, the Court has the power, under section 3004, to make an adjustment of the equities before the second trial.

There are several reasons in law and equity why the estates should be required to return the consideration before the liability trial begins. First, one of the estates' incentives for accepting the money and signing the releases was the possibility of obtaining money immediately rather than having to wait for years of trial and appeal. If the estates are now allowed to keep the money, they will be retaining this benefit without having to give any consideration therefor. Second, if the releases are not voided at this time, any estate that later recovers less than $250,000 (either directly or by third-party claim-over) from TGA, will have the option of ratifying the releases and not returning the money, and thus the distinctly unfair advantage of bearing no risk of losing by continuing to pursue this litigation. Third, the workers' compensation insurer, which was one of the companies of the aircraft liability insuring group, USAIG, agreed in the releases to waive any possible lien as against the $250,000 payments, but not any lien that may pertain to potential tort recovery—an additional option that the plaintiffs could consider if they were allowed to proceed with the releases voidable at their discretion. Finally, at least four of the releasing estates have made claims against Texasgulf under ERISA and its pension plan, claims which do not involve the insurance provided by USAIG, and which, therefore, cannot be directly offset by the sums paid for the releases. It is USAIG, not Texasgulf, that is entitled at this time to the return of the $1 million paid to these estates.

Each estate argues that it should be allowed to retain the $250,000 because it is certain to recover amounts in excess of that on its tort claim. Even if the premise of this argument is taken as true, it ignores the fact that there are five other defendants besides TGA. Unless TGA is found to be the primary tortfeasor, damages attributable to it could fall below $250,000 for some of the passengers' estates.

Also, with respect to the estates of the crew members, they are still confronted with a viable workers' compensation defense, because the jury found that the crew members were employed by TGA. Moreover, these two estates are faced with a substantial possibility of having their awards reduced if contributory negligence on the part of the crew members is found. Finally, these estates received an additional benefit from the releases in that USAIG agreed to assume responsibility for any claims asserted against the estates because of the negligence of the crew members. If the releases are rescinded, a question may arise as to cross-claims which might be asserted against these estates now that the jury has determined that the two crew members were employees of TGA, not Texasgulf.

■ It is true that no formal judgment is being entered at this time, or can be, since no affirmative claim is being finally adjudicated. However, the effect of the jury's verdict and this order is, in essence, a judgment rescinding the releases and finding them a nullity. Because of the considerations set forth above, we see no reason, pursuant to Fed.R.Civ.P. 62(h), to stay enforcement of what amounts to a judgment. We direct, therefore, that any estate wishing to take advantage of the jury's finding that the releases were obtained by misrepresentation must, within thirty days, tender $250,000 to Texasgulf's insurer, USAIG.[10]

---

**10.** TGI and USAIG seek interest on these sums. There is surprisingly little law in New York on the subject of payment of interest on consideration following rescission of a release. Considering that the grounds for the rescission were discovered only after a year or more of litigation, and that any attempt to achieve a rescission by returning the consideration would have been rejected out of hand, the Court in its dis-

Certain of the estates point out that Texasgulf, TGA, and its insurer continue to contend that the releases should be upheld. For trial purposes, of course, that issue is concluded. Their only remedy lies with an appeal. An interesting question arises as to whether Texasgulf and TGA will be able to appeal the release issue if the estates tender the consideration and it is accepted. However, that issue has not been briefed by the parties and is not before the Court at this time. Consequently, we express no opinion thereon.

If any estate fails to make a tender within thirty days of the date of this order, it will be deemed to have ratified the transaction and reaffirmed the release.

SO ORDERED.

cretion declines to assess interest on the sums      owed.