**Susan Winter WOODLING, as Executrix of the Estate of Albert D. Woodling, deceased, Plaintiff,**

v.

**TEXASGULF AVIATION, INC., Defendant.**

**Susan Winter WOODLING, as Executrix of the Estate of Albert D. Woodling, deceased, Plaintiff,**

v.

**The GARRETT CORPORATION, Colt Electronics Co., Inc., Phoenix Aerospace, Inc., and Lockheed Corp., Defendants.**

**Nos. 83 Civ. 3663 (GLG), 82 Civ. 3045 (GLG).**

United States District Court, S.D. New York.

June 3, 1986.

Kreindler & Kreindler, New York City, for plaintiff; Milton G. Sincoff, Steven R. Pounian, of counsel.

---

Townley & Updike, New York City, for Texasgulf, Inc. and Texasgulf Aviation, Inc.; Frederick D. Berkon, of counsel.

Costello & Shea, New York City and Perkins Coie, Seattle, Wash., for Garrett Corp.; Richard C. Coyle, Sherilyn Peterson, of counsel.

Haight, Gardner, Poor & Havens, New York City, Trial Attys. for all defendants; Randal R. Craft, Jr., of counsel.

## MEMORANDUM DECISION

GOETTEL, District Judge:

■ All the major parties to this wrongful death litigation have filed motions to amend the judgment in these cases.[1] The plaintiff has also moved for a new trial. The various motions raise numerous issues. Many of these issues were debated at length during the trial and need not be repeated.[2] Others are completely frivolous.[3] Some are humorous.[4] Still others are immaterial.[5] There are a few issues, however, that deserve some comment.

### A. Motion for a New Trial—Calculation of Future Damages

The plaintiff moves for a new trial because of claimed prejudicial error in this Court's instructions to the jury on the calculation of future damages.

The plaintiff presented an economic "expert" who began by computing the decedent's anticipated future earnings based on a number of debatable assumptions. Even accepting these assumptions, it was clear that the total figure was enormously exaggerated. At the time of his death, Albert Woodling was a young accountant making a modest salary. Based on current dollars, the plaintiff's expert was estimating that the decedent's final salary would be well up into six figures. The "expert" was repeatedly prodded by defense counsel and the Court to reconsider his arithmetic. He declined to do so, claiming he needed a computer to make his calculations, rather than the calculator proffered to him in court. At the conclusion of the court day, he returned to his office and worked with his computer. The next day, he confessed sheepishly that he had made a mathematical error of future lost earnings of almost a million dollars! (He blamed this error on an associate's computer input.)

The plaintiff's expert declared that the true investment rate of return in the future would be only one percent. The evidence established that, at the present time, several safe, tax-free investments are yielding

---

1. Two of the minor parties, Colt Electronics Co., Inc. and Phoenix Aerospace, Inc., have not moved, but their position in the litigation is analogous to that of the Garrett Corporation, which has moved.

2. For example, both the plaintiff and the defendants launch attacks upon the Second Circuit's decision in *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2d Cir.1984). Not surprisingly, they object to different parts of the same decision. They assume that a district court has the ability to ignore controlling appellate precedent simply because it is novel or not in accord with state law. A district court, of course, lacks such ability. Furthermore, the Second Circuit has recently cited the *Shu-Tao Lin* decision with approval in dealing with prejudgment interest in wrongful death actions determined under New York law. *Taliercio v. Compania Empressa Lineas Argentina*, 761 F.2d 126, 129 n. 3 (2d Cir.1985).

3. For instance, the plaintiff argues that the Court erred in instructing the jury, prior to recessing one night during deliberations, not to obtain their own discount tables or look at computations not otherwise available to them. The plaintiff suggests this instruction implied that they could use such tables if they could obtain them on their own. That construction of the Court's instruction to the jury is ridiculous.

4. The plaintiff contends that we committed reversible error by failing to *voir dire* the jury to determine if anyone had a bias against large verdicts. The jury returned a verdict in excess of a million dollars. Not much bias there.

5. Texasgulf Inc., for instance, argues that we should enter judgment in its behalf at this time. If that were done, the co-defendants would have to file a contingent cross-appeal, thus further cluttering the appellate proceedings. If the jury's verdict concerning the relationship between Texasgulf Inc. and Texasgulf Aviation, Inc. is affirmed on appeal and the judgment paid by Texasgulf Aviation, Inc., its insurer, or its parent, a judgment can then be entered in favor of Texasgulf Inc.

approximately seven percent. The evidence also established that the current inflation rate is only three and a fraction percent. Indeed, the plaintiff's expert acknowledged that there was no reason to assume a future inflation rate much in excess of four percent. Consequently, although the expert was predicting a future rate of one percent, the present true rate of return is approximately three to four percent.

■ The defendants called no economic experts. The Court, in its charge concerning the need for reducing future losses to current value, noted that the Court of Appeals for this Circuit, based on its analysis of long term historical figures, has suggested that the real investment return rate has averaged one and one-half to two percent a year. However, the charge also emphasized that the figures vary from time to time, depending on economic conditions, and that the jury was responsible for determining the correct figure in reducing the future damages to present value.

The plaintiff contends that this was prejudicial and reversible error, requiring a new trial. The plaintiff argues that the only evidence was her expert's opinion and that the jury was, therefore, compelled to accept, and should have been instructed to accept, a figure of one percent as the true long term future investment return rate.

We view the expert's opinion as a prediction, rather than as "evidence" in the true sense. The prediction made by the plaintiff's expert was contrary to the existing evidence of a present three to four percent rate, as well as the Second Circuit's holdings as to what the unimpeachable historical facts demonstrate. A jury is entitled to exercise its independent judgment even if opinion testimony is uncontradicted. *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627–28, 64 S.Ct. 724, 728–29, 88 L.Ed. 967 (1944); *Commercial Casualty*

*Insurance Co. v. Roman*, 269 N.Y. 451, 456–57, 199 N.E. 658 (1936).

In the federal system, the trial judge bears a heavy responsibility for seeing that a jury is not misled by questionable testimony. The Second Circuit has made it clear that district courts are obligated to prevent juries from being unduly influenced by economic experts who expound unreasonable computations of economic losses. We must do this by carefully instructing the jury before it considers improper evidence, rather than by reducing excessive verdicts after trial. *See Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984).

Chief Judge Weinstein, of the Eastern District of New York, recently discussed this duty of a federal trial judge in an address delivered at the Federal Bar Council Law Day Dinner in New York City. Upon being awarded the Learned Hand Medal for Excellence in Federal Jurisprudence, Judge Weinstein recalled Learned Hand's 1901 paper entitled, "Historical and Practical Considerations Regarding Expert Testimony." Hand had reflected on quandaries that still confront federal trial judges, *e.g.*, the ability of lay juries to evaluate evidence in fields as to which they are ignorant. After noting several solutions proposed by Judge Hand, Judge Weinstein concluded, "I support Hand's view that courts have the responsibility to prevent charlatans from overwhelming lay juries with hysteria and misleading pseudoscience." N.Y.L.J., May 2, 1986, at 3, col. 1. This Court's instructions in this case did no more than that. The instructions as a whole were proper and accurate. The plaintiff's assumption that the Court's instructions on reducing future damages to present value were responsible for an inadequate verdict is, at best, speculation, and, at worst, an attempt to avoid responsibility for presenting highly inaccurate and dubious expert testimony. The motion for a new trial is, therefore, denied.[6]

---

**6.** The plaintiff also argues that Fed.R.Civ.P. 51 mandates that the Court advise counsel of the entire substance of its charge in advance of summation, and that any failure to do so results

in surprise, requiring a reversal of the verdict. (We must say that we cannot understand how knowledge of the Court's exact charge, as mentioned above, would have affected the plaintiff's

### B. Motions to Amend Judgment—Prejudgment Interest

#### 1. Proof Requirements

In the motions to amend the judgment, the defendants raise a new and interesting proposition. They say that, since the Second Circuit now requires that prejudgment interest be entered only on those elements of damages that have accrued as of the time of trial, it is incumbent upon the plaintiff to prove those damages on a year-by-year basis. Alternatively, they contend, the prejudgment interest should be taken from the mid-point of the time between death and trial. There is some logic in this suggestion. The first proposal, however, is impractical and the second was not set forth as a requirement in any of the Second Circuit's cases separating past and future damages for purposes of prejudgment interest. Consequently, if the subject is to be refined in this fashion, we leave it to the appellate court that created the distinction to further define the rules.

#### 2. Refunded Release Payments

■ The last and only really troubling point raised by these motions addresses whether prejudgment interest should be reduced because the plaintiff initially received a substantial payment for signing a release in reliance on certain representations made by Texasgulf Aviation, Inc.'s attorneys and insurers. At the first stage of this trifurcated trial, a jury concluded that the plaintiff had been defrauded into accepting this payment so that the transaction should be rescinded, and the plaintiff allowed to pursue her claim for damages. Counsel for Texasgulf Inc. and Texasgulf Aviation, Inc. then moved for an order directing the plaintiff to return the $250,000 received in exchange for signing the release. That motion presented a close question of law. In a decision dated June 1, 1984, this Court held that the law did not require restoration of the amount received; however, the Court had the discretion to order return of the funds to prevent unjust enrichment. The plaintiff was directed to return the money or be deemed to have ratified the transaction and reaffirmed the release. The plaintiff returned the money.

Texasgulf Inc. and its insurer also sought interest on the sums to be returned. We denied that request, noting,

> There is surprisingly little law in New York on the subject of payment of interest on consideration following rescission of a release. Considering that the grounds for the rescission were discovered only after a year or more of litigation, and that any attempt to achieve a rescission by returning the consideration would have been rejected out of hand, the Court in its discretion declines to assess interest on the sums owed.

*Gregory v. Garrett Corp.*, 589 F.Supp. 296, 301 n. 10 (S.D.N.Y.1984).[7] An additional consideration that might have been noted was that the estates undoubtedly experienced transaction costs, and perhaps professional fees, in returning the monies. These costs were incurred because of what the jury found were the fraudulent misrep-

---

summation in any way.) The plaintiff's exceptions to the charge did not claim surprise or ask for any opportunity to further address the jury on that subject. Interestingly, Texasgulf Aviation, Inc.'s counsel made the same argument at the conclusion of the liability portion of this trial and the plaintiff disagreed with it. No authority exists for such a proposition. Indeed, the suggestion is most impractical. Rule 51 requires the Court to rule upon the requests to charge submitted by the parties. This Court did so. The total substance of the charge, however, is not finalized until the summations of the attorneys are delivered. In this instance, the summations took several hours. The total information that had to be imparted by the Court to the jury was not apparent until the closing

arguments were heard. (For example, an uncalled witness charge is not usually necessary unless one of the parties has argued that there was an uncalled witness.) In addition, it has been my practice to work on the charge and put it in final form during lengthy summations. Ideally, a trial court should be free to focus its full attentions upon the oratorical masterpieces presented by counsel in their closing arguments; however, the enormous litigation volume thrust upon the courts these days denies us this pleasure.

7. On a motion to reargue, the Court agreed to reconsider the issue after final judgment.

resentations of Texasgulf Inc. and its insurer.

Texasgulf Aviation, Inc. is in a somewhat stronger position arguing about the calculation of prejudgment interest at this time. It does seem somewhat anomalous to award prejudgment interest for the entire period up to the time of trial, when the plaintiff held a greater sum than her pretrial losses during a part of that period. However, the same considerations that motivated us to deny assessing interest at the time the funds were returned still exist. Under all of these circumstances, we deny the various motions by the defendants with respect to prejudgment interest.[8]

For the foregoing reasons, the plaintiff's motion for a new trial and all of the motions to amend the judgment are denied.

SO ORDERED.

8. The major defendants take differing positions on how the interest should be reduced because of the monies initially received and later returned by the estates. Since we do not agree with either of them, we need not evaluate the respective merits of their suggestions.