813 F.2d 543
 Susan Winter WOODLING, as Executrix of the Estate of Albert
D. Woodling, deceased, Plaintiff-Appellee, Cross-Appellant,
v.
The GARRETT CORPORATION, Colt Electronics Company, Phoenix
Aerospace, Inc., Lockheed Corporation and
Texasgulf Aviation, Inc., Defendants.
The GARRETT CORPORATION, Colt Electronics Company, Phoenix
Aerospace, Inc., and Lockheed Corporation, Third
Party Plaintiffs-Appellees,
The Garrett Corporation, Phoenix Aerospace, Inc., Third
Party Plaintiffs- Appellees, Cross-Appellants.
v.
TEXASGULF, INC. and Texasgulf Aviation, Inc., Third Party
Defendants- Appellants, Cross-Appellees.
 Nos. 208, 370, 239 and 236, Docket Nos. 86-7496, 86-7526,
86-7534 and 86-7541.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 3, 1986.
Decided March 3, 1987.
 
 Steven R. Pounian, New York City (Milton G. Sincoff, Kreindler & Kreindler, New York City, on the brief), for plaintiff-appellee, cross-appellant.
 Richard C. Coyle, Seattle, Wash. (Sherilyn Peterson, Perkins Coie, Seattle, Wash., on the brief), for third party plaintiff-appellee, cross-appellant The Garrett Corp.
 Randal R. Craft, Jr., New York City (John P. Marinan, Haight, Gardner, Poor & Havens, New York City, Steven B. Prystowsky, Lester Schwab Katz & Dwyer, New York City, Timothy W. Triplett, Blackwell Sanders Matheny Weary & Lombardi, Kansas City, Mo., on the brief), for third party plaintiff-appellee, cross-appellee Colt Electronics Co., Inc.
 Steven G. Emerson, Morris, Larson, King, and Stamper, Kansas City, Mo. (James L. Stengel, Donovan Leisure Newton & Irvine, New York City, on the brief), for third party plaintiff-appellee, cross-appellant Phoenix Aerospace Inc.
 Philip D. Pakula, New York City (Frederick D. Berkon, Mary D. Faucher, Townley & Updike, New York City, on the brief) for defendant-third party defendant-appellant, cross-appellee Texasgulf Aviation, Inc., and third party defendant-appellant, cross-appellee Texasgulf, Inc.
 Before FEINBERG, Chief Judge, OAKES and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Third-party-defendant Texasgulf, Inc. ("TG" or "TGI"), and defendant-third-party-defendant Texasgulf Aviation, Inc. ("TGA"), appeal from a judgment of the United States District Court for the Southern District of New York, entered in these consolidated actions after a series of jury trials before Gerard L. Goettel, Judge, in favor of plaintiff Susan Winter Woodling ("Woodling") for $1,142,888, including prejudgment interest, against TG, TGA, and defendants-third-party-plaintiffs The Garrett Corporation ("Garrett"), Phoenix Aerospace, Inc. ("Phoenix"), and Colt Electronics Company ("Colt"), for the wrongful death of her husband Albert D. Woodling ("Albert Woodling"). TG and TGA contend principally that the court erred (1) in failing to direct a verdict in their favor or to grant them judgment notwithstanding the verdict ("n.o.v.") either because they were protected from liability in the present suit by principles of workers' compensation immunity or because Woodling had validly released them from liability, and (2) in failing to grant them a new trial on the ground that there were errors in the evidentiary rulings and instructions to the jury.
 
 
 2
 Garrett and Phoenix cross-appeal from the judgment against them, contending principally that the court erred (1) in failing to grant them a directed verdict or judgment n.o.v. on the ground that TGA's conduct was a superseding cause that exonerated them from liability, and (2) in calculating the prejudgment interest to be awarded to Woodling. Garrett contends, in the alternative, that if TG and TGA are granted judgment as a matter of law, Garrett is entitled to a new trial because of a variety of alleged trial errors. Woodling cross-appeals from so much of the judgment as limited her recovery to $1,142,888, contending principally that she is entitled to a new trial as to certain elements of damage because of errors in the district court's rulings and instructions.
 
 
 3
 For the reasons below, we affirm so much of the judgment as holds TG, TGA, Garrett, and Phoenix liable to Woodling; we affirm in part and vacate in part the award of damages and remand for further proceedings.
 
 I. BACKGROUND
 
 4
 On February 11, 1981, a Lockheed Jetstar airplane (the "Jetstar"), owned by TG's wholly-owned subsidiary TGA, crashed near Westchester Airport in Westchester County, New York, killing its two-man crew and all six passengers. Albert Woodling, a 34-year-old Accounting Supervisor employed by TG in Raleigh, North Carolina, was one of the passengers.
 
 
 5
 In 1982 and 1983, Woodling brought the present actions in the district court under the New York wrongful death statute, N.Y.Est.Powers & Trusts Law ("EPTL") Secs. 5-4.1 to 5-4.6 (McKinney 1981 & Supp.1987); jurisdiction was based on diversity of citizenship. Woodling named as defendants, inter alios, TGA as owner and operator of the Jetstar; Phoenix as the designer and manufacturer of generator control units aboard the Jetstar, which were alleged to have malfunctioned and caused the crash; Garrett as the installer of those generator control units; and Colt, which had prepared the installation drawings for those units. Each of the defendants was alleged to have been negligent with respect to events leading to the crash.
 
 
 6
 TGA, which in 1982 had been dissolved and its assets distributed to TG, denied liability and asserted two affirmative defenses pertinent to its present appeal. First, it contended that TG and TGA were alter egos and that since TG was Albert Woodling's employer, TGA was protected from liability in the present action by North Carolina principles of workers' compensation immunity. Second, TGA contended that Woodling had entered into a valid agreement (the "Release") releasing TG and TGA from liability resulting from the crash in exchange for a payment of $250,000. Woodling, in response to the latter defense, sought rescission of the Release on the ground that TG had procured it by means of material misrepresentations.
 
 
 7
 The district court tried the action before juries in three stages.
 
 A. The Trial of the Affirmative Defenses
 
 8
 The first trial, held in the spring of 1984, dealt with TGA's affirmative defenses. As set forth in greater detail in Part II.A. below, Woodling presented evidence to show that, although TG paid the salaries of all TGA personnel, TGA was governed and operated as an entity separate from TG. The evidence included proof that TGA's pilots and maintenance employees were supervised by TGA officials; that both TG and TGA repeatedly certified to various state and federal agencies that TGA both owned and operated the aircraft; and that TGA entered into contracts in its own name for the lease, modification, and storage of aircraft and for the training and temporary employment of pilots. There was documentary and testimonial evidence that the technical aviation decisions with respect to TGA operations were made by TGA alone, not by TG.
 
 
 9
 As discussed in Part II.B. below, Woodling testified that she had signed the Release in reliance on TG officials' representations, inter alia, that TGA was essentially a shell that had "no employees," no "power to hire and fire the pilots and ground personnel," and "no business operations beyond holding title to the former TGI aircraft." Woodling testified that she had understood these representations to mean that TGA would have a workers' compensation defense to any wrongful death action she might bring. She also testified that she signed the Release because she was informed by TG and its insurer, United States Aircraft Insurance Group ("USAIG"), that a $250,000 insurance benefit payable to Albert Woodling's estate could not be received unless she signed such a release. Woodling testified that she was unaware that TG had another insurance policy with American Home Assurance Company ("American Home") which did not require such a release and which on its face covered aircraft accidents if the aircraft was not "owned or operated by the Policyholder," defined therein as "Texasgulf, Inc." She stated that had the existence and terms of the American Home policy been revealed to her, she would not have signed the Release.
 
 
 10
 TGA introduced the Release, which stated in part as follows:
 
 
 11
 This Release reflects the entire agreement between Releasor and Releasee concerning the subject matter hereof. Releasor has carefully read and fully understands the provisions of this Release and knows the contents thereof, and signs the same as Releasor's own free act, and avers that Releasor has not been influenced to any extent whatsoever in making and signing same by any representations or inducements whatsoever by Releasee, other than as set forth herein.
 
 
 12
 In addition, TGA introduced proof that the American Home policy did not in fact cover the death of Albert Woodling because the language that appeared to cover that event was the inadvertent result of a mutual mistake between TG and the carrier. TGA moved for a directed verdict in its favor on the basis of either or both of its affirmative defenses.
 
 
 13
 The district court denied the motion and submitted special interrogatories to the jury with respect to each defense. The court instructed the jury that in fact Albert Woodling's death was not covered by the American Home policy and that the jury should decide whether the nondisclosure of the policy with its mistaken facial coverage was a fraudulent or material misrepresentation.
 
 
 14
 The jury found in favor of Woodling on both of TGA's defenses. Rejecting the workers' compensation immunity defense, the jury found that TG and TGA were separate entities and that TGA was the employer of the flight crew and maintenance personnel involved in the events leading to the crash. Rejecting the release defense, the jury found that TGA was the operator of the airplane involved in the crash, that TG or USAIG had made fraudulent or material misrepresentations both with regard to the status and operations of TGA and with regard to the existence and coverage of the American Home policy, and that Woodling had justifiably relied on each set of misrepresentations in signing the Release. See Gregory v. Garrett Corp., 589 F.Supp. 296, 298-99 (S.D.N.Y.1984).
 
 
 15
 TGA moved unsuccessfully for judgment n.o.v. and for a new trial. In addition, on the ground that Woodling should not be allowed to rescind the Release agreement without returning the consideration she received, TG and TGA moved for an order requiring Woodling to return to TG its $250,000. The court granted this motion, and in order not to compromise TGA's ability to pursue on appeal its challenge to the decision allowing rescission of the Release, the court allowed Woodling to place the money in an interest-bearing escrow account. The court denied the request that Woodling be required to pay TG interest on the $250,000 for the period during which she had retained possession of it. See id. at 301 n. 10.
 
 B. The Trial of the Liability Issues
 
 16
 In the fall of 1984, the liability issues were tried. The jury found that the four defendants who are parties to this appeal were, to varying degrees, negligent and jointly liable for causing the crash. The jury assessed the relative culpability of these defendants as follows: TGA, as owner and operator of the Jetstar, 70%; Garrett, installer of the generator control units on the Jetstar, 20%; Phoenix, designer and manufacturer of the units, 5%; and Colt, preparer of the installation drawings, 5%.
 
 
 17
 No defendant challenges here the sufficiency of the evidence to support the finding of its negligence. The principal appellate issues arising from the liability trial are the contentions of Garrett and Phoenix that they were entitled to a directed verdict or to judgment n.o.v. on the ground that the conduct of TGA was a supervening cause of the crash that entirely exonerated them from liability. These contentions and the pertinent evidence at the liability trial are discussed in Part II.C. below.
 
 C. The Trial of the Damages Issues
 
 18
 In March 1986, the damages issues were tried. Woodling sought damages for past and future losses of support, services, and fatherly care and guidance. She presented, inter alia, evidence that Albert Woodling's annual salary at the time of his death was approximately $32,000 and expert testimony as to his reasonably expected increases from age 34 to retirement and the likely effect of inflation on those earnings. The trial court permitted defendants to cross-examine Woodling's expert as to the likely effect of income taxes and social security taxes on Albert Woodling's lost future earnings.
 
 
 19
 The court submitted interrogatories to the jury with respect to each element of damage claimed by Woodling. It instructed the jury to deduct likely income taxes from Albert Woodling's gross income in calculating the amount to be awarded for lost support; no instruction was given with regard to the effect of social security taxes. As to the proper discount rate, reduced for the effect of inflation, the court instructed the jury as follows:
 
 
 20
 The plaintiffs' expert has suggested that the real investment return rate is 1 percent per year after allowing for the effects of inflation. Our appellate court has suggested that from an analysis of long term figures the real investment return rate has averaged one and a half or 2 percent per year. But these figures vary from time to time depending on economic conditions. You must determine what figure is appropriate in bringing the award down to present value.
 
 
 21
 Thus, you must award one sum for each of the future pecuniary losses which when invested will provide the widow and children with the same increasing values of future support[,] care and services that Albert Woodling if still alive would have provided to his family.
 
 
 22
 The jury returned its special verdict awarding Woodling a total of $1,055,000 for the following categories of injury:
 
 
 23
 Past loss of support $150,000
Future loss of support $600,000
Past loss of fatherly care and
 guidance $25,000
Future loss of fatherly care and
 guidance $235,000
Past loss of services $ 20,000
Future loss of services $ 25,000
 
 
 24
 Following this verdict, the court entered the final judgment here appealed, awarding Woodling the $1,055,000, plus $87,888 representing prejudgment interest for the period between Albert Woodling's death and the entry of judgment on the sums awarded for past losses, for a total of $1,142,888. The judgment reflected the jury's assessment of defendants' relative culpability (TGA 70%; Garrett 20%; Phoenix and Colt 5% each) by providing that each defendant was entitled to contribution from the others in accordance with that assessment.
 
 
 25
 Although TG had not been sued directly by Woodling, the court entered the judgment in Woodling's favor against TG as well on the basis that when TGA, as TG's wholly owned subsidiary, was dissolved in 1982, assets in excess of the amount of the judgment were distributed to TG. Motions to vacate or modify the judgment were denied, and these appeals followed.
 
 D. The Issues on These Appeals
 
 26
 On appeal, the parties renew various of the contentions they made during and after the trials below. Defendants other than Colt contend principally that they were entitled to judgment as a matter of law finding them not liable to Woodling and that, even if they were liable, the court erred in calculating the prejudgment interest to which Woodling was entitled. Woodling contends that the court erred in instructing the jury as to damages and in calculating prejudgment interest.
 
 
 27
 For the reasons below, we find no merit in defendants' contentions on the liability issues. As to the damages issues, we conclude that the court erred in (1) allowing the jury to deduct income taxes from Albert Woodling's future lost earnings, (2) calculating the prejudgment interest to which Woodling was entitled, and (3) failing to require Woodling to pay TG interest on the $250,000 for the period during which she had use of that money prior to her rescission of the Release agreement.
 
 II. LIABILITY
 
 28
 In challenging so much of the judgment as held them liable to Woodling, TG and TGA contend principally that TGA was entitled to judgment as a matter of law on its defenses of workers' compensation immunity and release. Garrett and Phoenix contend principally that they were entitled to judgment as a matter of law on the ground that, because of TGA's supervening conduct, their own negligence was not a proximate cause of the crash. We find no merit in any of defendants' liability arguments.
 
 
 29
 A. TGA's Workers' Compensation Immunity Defense
 
 
 30
 Under North Carolina law, which the parties agree governs TGA's workers' compensation immunity defense, if an employer is covered by the Workers' Compensation Law, suit may not be brought by or on behalf of an employee injured or killed in the course of his employment on the basis of negligence of the employer or a fellow employee. See N.C.Gen.Stat. Secs. 97-2, 97-9, 97-10.1 (1985). TGA contends principally that Woodling's suit was barred under this statute either because TGA was the alter ego of TG and hence should be treated as Albert Woodling's employer for these purposes, or because, in light of TG's payment of the salaries of TGA personnel, both these personnel and TGA were employees of TG and hence fellow employees of Albert Woodling. We conclude that the district court did not err in refusing to uphold either of these contentions as a matter of law, for both depended on factual premises as to which, on the basis of the evidence presented at trial, reasonable minds could reject TGA's view.
 
 
 31
 Whether one is an employee of a particular employer within the meaning of N.C.Gen.Stat. Sec. 97-2(2) is a question of fact to be determined by applying the common-law tests for finding an employer-employee relationship. See Hayes v. Board of Trustees of Elon College, 224 N.C. 11, 29 S.E.2d 137, 140 (1944); Carter v. Frank Shelton, Inc., 62 N.C.App. 378, 303 S.E.2d 184, 187 (1983), review denied, 310 N.C. 476, 312 S.E.2d 883 (1984). The right to control the employee, i.e., "the power to set work hours, assign duties and establish the manner of performance," is determinative of who is the employer. Barrington v. Employment Security Commission, 55 N.C.App. 638, 286 S.E.2d 576, 579, review denied, 305 N.C. 584, 292 S.E.2d 569 (1982); accord Lucas v. Li'l General Stores, 289 N.C. 212, 221 S.E.2d 257, 261-62 (1976); Carter v. Frank Shelton, Inc., 303 S.E.2d at 187. In the absence of supervisory control, the payment of salary and the right to hire and discharge are insufficient to establish employer status. See Barrington v. Employment Security Commission, 286 S.E.2d at 579; Godley v. County of Pitt, 54 N.C.App. 324, 283 S.E.2d 430, 432 (1981), rev'd on other grounds, 306 N.C. 357, 293 S.E.2d 167 (1982); Forgay v. North Carolina State University, 1 N.C.App. 320, 161 S.E.2d 602, 606 (1968). Whether such control exists is usually a question of fact for the jury. See Restatement (Second) of Agency Sec. 220 comment c (1958).
 
 
 32
 There could be little question that the Jetstar was operated by TGA. There was evidence that TG and TGA had repeatedly certified to various state and federal agencies that TGA owned and operated the aircraft; indeed, they twice made such certifications with specific reference to the crash at issue here. Under the above principles, therefore, the principal fact question for the jury was which company had supervisory control of the TGA personnel at the pertinent times. Taking the evidence in the light most favorable to Woodling as nonmoving party and giving her the benefit of all reasonable inferences and credibility evaluations, as we must in reviewing a denial of a motion for judgment n.o.v., see, e.g., Mattivi v. South African Marine Corp., 618 F.2d 163, 167-68 (2d Cir.1980), we conclude that there was ample proof that TGA, not TG, had supervisory control of TGA personnel with respect to all matters of flight safety and operation.
 
 
 33
 First, there was evidence that TGA personnel could not be overruled by TG personnel on matters of flight safety and operation. The TGA Operations Manual stated that the captain of the airplane has
 
 
 34
 complete and final authority as to its operation.... At any time, the Captain may delay, re-route or terminate a trip for any reason which, in his opinion, may compromise the safety of the passengers and the aircraft. UNDER NO CIRCUMSTANCES WILL ANY PASSENGER BE ALLOWED TO OVERRULE THE CAPTAIN CONCERNING THE CONDUCT OF THE FLIGHT.
 
 
 35
 (Emphasis in original). A number of witnesses testified that the TGA pilots, not TG personnel, in fact made the determinations concerning when and which planes could fly, when to cancel flights for mechanical or other safety reasons, and when to divert aircraft in mid-flight for safety reasons. These witnesses included TGA's chief pilot and the widow of TG's Chairman who died in the crash. In addition there was evidence that TGA's president and its director of maintenance personally supervised the operations of the TGA pilots and maintenance personnel.
 
 
 36
 Plainly there was sufficient evidence to permit the jury to infer that at the time of the crash the Jetstar was operated by TGA personnel under the supervision and control of TGA and that TG did not control those operations. Accordingly, there was no basis for the requested ruling that TG was as a matter of law the employer of either TGA or TGA's personnel.
 
 
 37
 TG and TGA also argue that N.C.Gen.Stat. Sec. 97-9's extension of the employer's immunity to "those conducting his business" entitled TGA to judgment. We disagree, for it was not established as a matter of law either that TG and TGA were alter egos or that TGA was merely conducting the business of TG. The evidence was that TG, which was substantially foreign-owned, had set up TGA as a separate entity incorporated in the United States for the purpose of registering aircraft with the Federal Aviation Agency. TG chose the name "Texasgulf Aviation, Inc." because, according to TG board of directors minutes, it was "not so similar to the name of [TG] as to tend to confuse or deceive." TGA had a board of five directors; only one was also a director of TG. TGA operated out of White Plains, New York, while TG was headquartered in Stamford, Connecticut. TGA made and signed contracts in its own name, including contracts for the lease, modification, and storage of its aircraft and contracts for the training of pilots. TGA personnel referred to themselves as employees of TGA, not of TG. And, as discussed above, TGA, not TG, had the final say with respect to all important matters of the flight and safety of TGA aircraft.
 
 
 38
 These facts, which would have sufficed to insulate TG from common-law liability for the acts of TGA, also sufficed to defeat this facet of TGA's workers' compensation immunity defense, for a North Carolina court would not find TGA to have been conducting the business of TG within the meaning of Sec. 97-9 if it could not hold TG liable for TGA's acts. See Lewis v. Barnhill, 67 N.C. 457, 148 S.E.2d 536, 544 (1966); see also McWilliams v. Parham, 269 N.C. 162, 152 S.E.2d 117, 122 (1967) (stockholder does not possess corporation's workers' compensation immunity from suit); cf. Thomas v. Maigo Corp., 37 A.D.2d 754, 754, 323 N.Y.S.2d 106, 106-07 (4th Dep't 1971) (subsidiary that was distinct legal entity was not employee of parent for purposes of workers' compensation immunity); Daisernia v. Co-operative G.L.F. Holding Corp., 26 A.D.2d 594, 594-95, 270 N.Y.S.2d 542, 543 (3d Dep't 1966) (same).
 
 
 39
 The vast majority of courts have declined to disregard the corporate veil to extend one corporation's workers' compensation immunity to another. See O'Brien v. Grumman Corp., 475 F.Supp. 284, 292 (S.D.N.Y.1979) (collecting cases); Annot., 30 A.L.R.4th 948, 951 (1983) (same). The North Carolina case most closely on point refused to do so even when the parent and subsidiary shared administrative offices, purchasing agents, personnel department, and sales organization. See Phillips v. Stowe Mills, Inc., 5 N.C.App. 150, 167 S.E.2d 817, 820 (1969); cf. Thomas v. Maigo Corp., 37 A.D.2d at 754, 323 N.Y.S.2d at 106 (subsidiary was separate legal entity from parent and was not covered by parent's immunity even though subsidiary was wholly-owned, controlled, dominated, and financed by parent). Given the significant legal and corresponding financial advantages of separate incorporation, we decline to extend North Carolina law so as to disregard the corporate veil in order to expand workers' compensation immunity and thereby remove one of the few reciprocal burdens of such advantages. See Boggs v. Blue Diamond Coal Co., 590 F.2d 655, 662 (6th Cir.), cert. denied, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979).
 
 B. TGA's Release Defense
 
 40
 Woodling sought rescission of the Release she had signed in favor of TG and TGA on the ground that she had been induced to sign it as a result of material misrepresentations with respect to two matters: TG's total control over TGA's operations and the availability of an insurance benefit to Albert Woodling's estate under the American Home policy. The jury answered interrogatory questions favorably to Woodling on both issues, and rescission was granted. TG and TGA ask us to uphold the validity of the Release on a variety of grounds or at least to grant a new trial because of alleged errors in the conduct of the trial. We find their arguments with respect to the misrepresentations as to TGA operations to be without merit, and since this ground for rescission was independent of the question of whether Woodling had also relied on misrepresentations as to available insurance benefits, we need not reach the latter ground.
 
 1. Choice of Law
 
 41
 The Release provided that "[t]he validity, effect and enforceability, as well as the rights of the parties hereto regarding this Release shall be governed, construed and interpreted solely in accordance with the laws of the State of Connecticut." Since this is a diversity action, the district court, sitting in New York, properly looked to the choice-of-law rules of New York to determine whether and to what extent the parties' contractual choice should be honored.
 
 
 42
 When such a provision exists and the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance, New York law requires the court to honor the parties' choice insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated. See A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 381, 165 N.Y.S.2d 475, 486, 144 N.E.2d 371, 379 (1957); Restatement (Second) of Conflict of Laws Sec. 187 (1971). The contractual choice of law provision is deemed to import only substantive law, however, not procedural law. See Sears, Roebuck & Co. v. Enco Associates, Inc., 43 N.Y.2d 389, 397, 401 N.Y.S.2d 767, 772, 372 N.E.2d 555, 560 (1977); Gambar Enterprises, Inc. v. Kelly Services, Inc., 69 A.D.2d 297, 304, 418 N.Y.S.2d 818, 822 (4th Dep't 1979); Restatement (Second) of Conflict of Laws Sec. 187(3) & comment h.
 
 
 43
 The issues of the validity and enforceability or voidability of a release are plainly matters of substance as to which the parties' choice of law will be honored. See Siegelman v. Cunard White Star Ltd., 221 F.2d 189, 194-95 (2d Cir.1955); Restatement (Second) of Conflict of Laws Sec. 201 & comment a. The extent to which the parol evidence rule may be applicable to bar extraneous evidence to show the voidability of a release is also considered by New York conflicts law to be a matter of substance. See Smith v. Bear, 237 F.2d 79, 83 (2d Cir.1956); Restatement (Second) of Conflict of Laws Sec. 205 comment e. The question of burden of proof, on the other hand, is regarded by New York law as a question of procedure to which the law of the forum applies. See Lobel v. American Airlines, Inc., 192 F.2d 217, 219 (2d Cir.1951), cert. denied, 342 U.S. 945, 72 S.Ct. 558, 96 L.Ed. 703 (1952); Clark v. Harnischfeger Sales Corp., 238 A.D. 493, 495, 264 N.Y.S. 873, 876 (2d Dep't 1933); Wright v. Palmison, 237 A.D. 22, 22, 260 N.Y.S. 812, 813 (2d Dep't 1932).
 
 
 44
 Since Connecticut is the principal place of business of TG, the court properly honored the parties' contractual choice of Connecticut law with regard to matters of substance, and looked to that law with respect to the issues of the validity and enforceability or voidability of the Release, and with respect to the admissibility of parol evidence on those issues. It properly applied the law of New York on the issue of burden of proof.
 
 
 45
 2. Representations Concerning TGA's Operations
 
 
 46
 Woodling testified that prior to signing the Release, she had received a letter from TG purporting to set forth "information [that] pertains to the relationship between [TG] and [TGA]." The letter stated that TGA had "no employees" and "no business operations beyond holding title to the former TGI aircraft"; that "[a]ll pilots and aircraft support personnel are employees of TGI at Stamford, Connecticut"; and that "TGI has the sole power to hire and fire the pilots and ground personnel." TG and TGA contend that they were entitled to have judgment as a matter of law dismissing this basis for rescission because, inter alia, the claimed misrepresentations were matters of opinion rather than fact, they were fair and reasonable, and, in any event, Woodling could not justifiably rely on them. We find no merit in any of these contentions.
 
 
 47
 Under Connecticut law, even an innocent material misrepresentation can provide grounds for avoidance of a contract. See Duksa v. City of Middletown, 173 Conn. 124, 376 A.2d 1099, 1101 (1977). To be a misrepresentation, however, a statement must falsely assert fact rather than opinion. See Restatement (Second) of Contracts Sec. 159 & comment a (1981). The test for whether a statement is one of opinion or fact is whether "under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distinguished from one of opinion." Crowther v. Guidone, 183 Conn. 464, 441 A.2d 11, 13 (1981); see also Board of Water Commissioners of City of New London v. Robbins & Potter, 82 Conn. 623, 74 A. 938, 943 (1910) (estimates supplied as approximately correct "information" to be relied on were statements of fact not opinion). Moreover, a statement of opinion, including one regarding the application of the law to facts, impliedly asserts that the facts known to the maker are not incompatible with that opinion. See Restatement (Second) of Contracts Secs. 168(2)(a), 170 comment b. Of course, even if the facts explicitly and implicitly represented are literally true, there may still be a misrepresentation if the statement is a half-truth because it omits reference to material unfavorable matter. See id. Sec. 159 comment b; Duksa v. City of Middletown, 376 A.2d at 1101; Franchey v. Hannes, 152 Conn. 372, 379, 207 A.2d 268, 271 (1965); Wedig v. Brinster, 1 Conn.App. 123, 469 A.2d 783, 788 (1983), cert. denied, 192 Conn. 803, 472 A.2d 1284 (1984).
 
 
 48
 The evidence at trial was sufficient to show that the TG representations as to its control over TGA operations were intended as and taken as assertions of fact. The letter itself characterized these assertions as "information." TG's Senior Counsel, Eugene McGuire, testified that these assertions were not the product of any legal research; he referred to them as "facts." Woodling testified that at a meeting with a TG representative these matters were discussed as "facts" that would provide a basis for a workers' compensation defense if Woodling were to bring suit against TGA. The trial court properly instructed the jury that TGA had the burden of proving that the Release was valid, see Mangini v. McClurg, 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 514, 249 N.E.2d 386, 390 (1969), and that if the jury found the assertions merely to be opinions it should find in favor of TGA. The jury's finding that these were assertions of purported fact was a fair inference from the trial evidence and may not be set aside.
 
 
 49
 The question of whether these representations were fair and reasonable conclusions on the part of TG also presented a fact issue that, in light of the evidence at trial, was an entirely inappropriate basis for a directed verdict or judgment n.o.v. There was ample evidence as to TGA's unfettered control over its own aviation activities, discussed in Part II.A. above, from which the jury could have concluded that the representations were literally false or at best half-truths.
 
 
 50
 Notwithstanding a defendant's express or implied misrepresentations, a plaintiff may be denied recovery under Connecticut law if reliance on those misrepresentations was unjustified. When the premise of such unjustifiability is the plaintiff's failure to discover the truth, Connecticut law precludes recovery only if that failure was so extreme as to be, in itself, a breach of good faith and fair dealing. Pacelli Brothers Transportation, Inc. v. Pacelli, 189 Conn. 401, 456 A.2d 325, 329 (1983); Restatement (Second) of Contracts Sec. 172 & comment a. Consequently, the plaintiff's failure to make a reasonable investigation does not bar relief unless the truth would have been uncovered by even a cursory examination. Id. Sec. 172 comment b; see Clark v. Haggard, 141 Conn. 668, 109 A.2d 358, 361 (1954); Kavarco v. T.J.E., Inc., 2 Conn.App. 294, 478 A.2d 257, 262 (1984). A plaintiff's mere negligence in failing to discover that a representation was false is no defense to an action for rescission. Id. Nor do general principles of common law bar an action based on reliance on representations made by a lawyer for an antagonistic interest, even when the recipient is also represented by a lawyer. See, e.g., Sainsbury v. Pennsylvania Greyhound Lines, 183 F.2d 548, 550-52 (4th Cir.1950); National Conversion Corp. v. Cedar Building Corp., 23 N.Y.2d 621, 626, 298 N.Y.S.2d 499, 503, 246 N.E.2d 351, 354 (1969); Madison Trust Co. v. Helleckson, 216 Wis. 443, 257 N.W. 691, 693-95 (1934); cf. Restatement (Second) of Torts Secs. 540 & comment a, 541 comment a (1977) (independent investigation not required to make reliance justifiable even when maker of misrepresentation is an adverse party). If anything, a lawyer's duties of professional responsibility render such reliance on factual representations particularly justifiable. See generally Sainsbury v. Pennsylvania Greyhound Lines, 183 F.2d at 551-52; cf. A.B.A. Model Code of Professional Responsibility DR 7-102(A)(5) (1983) ("a lawyer shall not ... [k]nowingly make a false statement of law or fact").
 
 
 51
 Woodling's reliance on the statements of McGuire, a member of the bar, in the context of a relationship that both she and McGuire characterized as one of trust and confidence regarding facts concerning TG's and TGA's internal operations cannot be characterized, as a matter of law, as a breach of good faith and fair dealing on her part. Plainly it would have taken far more than a cursory examination by her to reveal the actual facts.
 
 
 52
 Reliance by TG and TGA on Krupa v. Kelley, 5 Conn.Cir. 127, 245 A.2d 886 (1968), is misplaced. In Krupa, an insurance company offered plaintiffs $3,000, stating that was what their claim was worth. The plaintiffs declined the offer. When they later sought to avoid the bar of the statute of limitations, the court held there had been no fraudulent concealment. 245 A.2d at 890. In Krupa, unlike the present case, there was no proof that the defendant misrepresented or even knew of adverse facts and the plaintiffs' rejection of the settlement offer conclusively proved there was no reliance at all.
 
 
 53
 Finally, Woodling's claim of reliance on the statements as to TG's control of TGA's operations was not barred by the disclaimer in the Release stating that she "ha[d] not been influenced to any extent whatsoever in making and signing same by any representations or inducements whatsoever by [TG and TGA]." It is well settled under Connecticut law that parol evidence is admissible to show fraud or misrepresentation. See Jay Realty, Inc. v. Ahearn Development Corp., 189 Conn. 52, 453 A.2d 771, 773 (1983); Paiva v. Vanech Heights Construction Co., 159 Conn. 512, 271 A.2d 69, 73-74 (1970); Kiss v. Kahm, 132 Conn. 593, 46 A.2d 337, 338 (1946). The presence of a disclaimer such as that signed by Woodling provides no exception to this general rule. See New Haven Tile & Floor Covering Co. v. Roman, 137 Conn. 462, 78 A.2d 336, 337 (1951) (even though written agreement stated that terms could not "be varied by any verbal representation or promise," parol evidence to show that agreement was not binding and valid was admissible); see also Restatement (Second) of Contracts Sec. 214 comment e; cf. Sabo v. Delman, 3 N.Y.2d 155, 160-62, 164 N.Y.S.2d 714, 717-19, 143 N.E.2d 906, 908-10 (1957) (general merger clauses do not bar claim for misrepresentation).
 
 
 54
 In sum, the trial court properly applied the pertinent principles of governing law. TGA was not entitled to a directed verdict or judgment n.o.v. on its defense of release, and we see no basis for overturning the jury's findings against it.
 
 
 55
 C. The Supervening Cause Arguments of Garrett and Phoenix
 
 
 56
 The principal contentions of Garrett and Phoenix on their appeals are that they were entitled to judgment n.o.v. because their negligence, conceded for purposes of these arguments, was not the proximate cause of the crash of the Jetstar because of the supervening conduct of TGA. We reject these contentions.
 
 
 57
 Preliminarily, we note our rejection of Woodling's contention that these arguments were not properly preserved for appeal. Phoenix's written motion for a directed verdict specifically referred to lack of proximate cause as a ground. The oral motions of both Phoenix and Garrett for a directed verdict were made "on all possible grounds," and the district court stated this was "sufficient" to preserve the record. Woodling neither objected to the lack of specificity in the directed verdict motions nor opposed the judgment n.o.v. motions on this ground. On this record, the issue of the sufficiency of the evidence concerning proximate cause was preserved for appeal. See, e.g., Mosley v. Cia. Mar. Adra, S.A., 362 F.2d 118, 121-22 (2d Cir.), cert. denied, 385 U.S. 933, 87 S.Ct. 292, 17 L.Ed.2d 213 (1966).
 
 
 58
 The evidence at the liability trial painted the following picture as to the cause of the crash. At 6:40 p.m. on February 11, 1981, in darkness, with visibility limited by weather, the Jetstar was attempting an instrument landing approach. The jet's electrical equipment, including the cockpit navigation instruments, was powered by four engine generators, each regulated by its own generator control unit ("GCU"). As the plane descended, the GCUs "tripped" the four generators, i.e., disconnected them from the electrical equipment. At first, backup batteries provided power for resetting the generators and essential equipment; but the GCUs continued to disconnect intermittently, depleting and finally exhausting the batteries. The final tripping occurred when the plane was about 500 feet above the ground. The plane crashed some 20 seconds later, a mile short of the runway and 2,300 feet to the right of course.
 
 
 59
 The generators had been installed in the Jetstar by Garrett in late January 1981. On January 31, Garrett's electrician was present during TGA's ensuing test flights. On the first of those flights a single generator tripped, was reset, tripped again, and was reset again; then all four generators tripped. On a second test flight, one generator again tripped twice and had to be reset. On a third flight, there was no tripping. Garrett employees testified that they never discovered the cause of the problem, but they told TGA that the tripping problem had been solved.
 
 
 60
 There was testimony that TGA reported further tripping problems to Garrett on two other occasions prior to the date of the crash. Garrett's electrical shop supervisor testified that from these reports he "knew the condition still existed." Garrett personnel admitted that they knew Garrett did, at its own facility, all major maintenance for TGA aircraft and that TGA relied on Garrett's expertise, including that concerning electrical problems. Garrett never advised TGA to ground the Jetstar because of the tripping.
 
 
 61
 The generators had been designed by Phoenix. In the ten days prior to the crash, Phoenix was informed once of a double tripping of the generators and once that three generators had tripped. On the day of the crash, a TGA official informed Phoenix that multiple tripping had occurred that morning. Phoenix admitted that it knew TGA was relying on its knowledge and advice with respect to the proper functioning and safety of the generators. It never advised TGA to ground the plane.
 
 
 62
 Woodling's expert witnesses testified that the multiple tripping should have indicated that a systemic problem remained, that both Phoenix and Garrett had greater expertise than TGA with respect to such problems, that Garrett should have asked TGA to ground the Jetstar until Garrett could repair it, and that Garrett should have known that TGA would be unable on its own to know whether the problem was solved.
 
 
 63
 In support of their arguments that TGA's conduct was the supervening cause of the crash and hence relieves them of liability as a matter of law, Garrett and Phoenix point principally to evidence that TGA's pilots and maintenance director were aware of all of the incidents of tripping; that they were aware that at least three of the four generators had tripped out during a flight on the morning of the crash and had been off-line for several minutes; and that TGA pilots were aware of the weather forecast for the Westchester area on the evening of the crash, which predicted an overcast sky, fog, occasionally heavy rain, light thunder showers, winds at 15 knots, and obscured visibility. TGA's chief pilot testified that in order to fly in such conditions, a plane is required to have flight instruments that are working and that the loss of all four generators would be unacceptable at night or in bad weather conditions because that loss would soon exhaust the backup battery power and leave the pilot without means to navigate the plane.
 
 
 64
 Given all the evidence, the proximate cause issues were properly submitted to the jury. Under New York law, which the parties agree governs the tort issues in this case, notwithstanding the intervention of an act of a third person between the original negligence and the ultimate injury, the original negligent actor can be found to have proximately caused the injury if the intervening act was normal or foreseeable. See Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315-16, 434 N.Y.S.2d 166, 169-70, 414 N.E.2d 666, 670 (1980) ("Derdiarian "); Bonsignore v. City of New York, 683 F.2d 635, 638 (2d Cir.1982); Vasina v. Grumman Corp., 644 F.2d 112, 114-15 (2d Cir.1981) ("Vasina "). When, as is usually the case, circumstances permit varying inferences as to the foreseeability of the intervening act, the proximate cause issue is a question of fact for the jury. See Derdiarian, 51 N.Y.2d at 315, 434 N.Y.S.2d at 170, 414 N.E.2d at 670; Vasina, 644 F.2d at 114. If the intervening act was foreseeable, it does not excuse the original actor that the intervening act was "reckless," Derdiarian, 51 N.Y.2d at 316, 434 N.Y.S.2d at 170, 414 N.E.2d at 671, or intentional, see Kush v. City of Buffalo, 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 835, 449 N.E.2d 725, 729 (1983), or even intentional and criminal, see Nallan v. Helmsley-Spear, Inc., 50 N.Y.2d 507, 520-21, 429 N.Y.S.2d 606, 614, 407 N.E.2d 451, 459 (1980); Bonsignore v. City of New York, 683 F.2d at 638. A fortiori, the fact that the intervening actor, such as an employer who controls defective machinery, knows of the dangers and merely fails to warn or otherwise protect the plaintiff does not of itself relieve the original actor from liability. See Cohen v. St. Regis Paper Co., 65 N.Y.2d 752, 754, 492 N.Y.S.2d 22, 24, 481 N.E.2d 562, 564 (1985); accord Farley v. Edward E. Tower & Co., 271 Mass. 230, 171 N.E. 639, 642-43 (1930). Nor should we strain to relieve a negligent party from responsibility because of an intervening act when the original negligence created a situation of "extreme danger." Prosser & Keeton on the Law of Torts Sec. 44, at 319 (5th ed. 1984); cf. Gordon v. Niagara Machine & Tool Works, 574 F.2d 1182, 1193-94 (5th Cir.1978) (high likelihood and grievous nature of potential harm are factors in finding that employer's failure to pass on warnings was not a supervening cause).
 
 
 65
 The trial evidence, taken in the light most favorable to Woodling, provided an ample basis for submitting the proximate cause issues to the jury. To Garrett's and Phoenix's knowledge, TGA had been flying the Jetstar despite ongoing tripping problems for more than a week. It was thus entirely reasonable for the jury to conclude that it was foreseeable to both Garrett and Phoenix that despite the systemic problems with the generators, TGA would not on its own know enough or be resolute enough either to solve the problem or to ground the plane. Especially given the potential for loss of life that was foreseeable to Garrett and Phoenix, there was sufficient evidence that the negligence of Garrett and that of Phoenix were proximate causes of the crash.
 
 
 66
 McLaughlin v. Mine Safety Appliances Co., 11 N.Y.2d 62, 226 N.Y.S.2d 407, 181 N.E.2d 430 (1962), and Boltax v. Joy Day Camp, 67 N.Y.2d 617, 499 N.Y.S.2d 660, 490 N.E.2d 527 (1986), do not require a different result. Boltax is distinguishable because there was no pattern of constant consultation on the problem, the situation was not one of inherently extreme danger that required expertise to fathom, and the "intervening" actor was the plaintiff himself. While the discussion in McLaughlin might be read to suggest that an intervening actor's gross negligence is a superseding cause that relieves the original negligent actor from liability, see 11 N.Y.2d at 71, 226 N.Y.S.2d at 414, 181 N.E.2d at 435, the more recent New York cases discussed above, holding that reckless, intentional, and even criminal intervening acts are not superseding causes when they are foreseeable, indicate that such a reading would not accurately reflect current New York law. In any event, McLaughlin was a case in which the court found that the intervening act was entirely unforeseeable. There the product's container bore a warning as to the product's proper use; the intervening actor had been advised orally by the manufacturer's representative of the proper manner of use, and had received a formal demonstration of proper use. Yet the intervening actor removed the product from its carton before handing it to another person to use, thereby preventing the user from reading the manufacturer's warning, gave no oral warnings of his own to the user, and stood watching "callously" as the product was administered in precisely the manner proscribed by the manufacturer's warnings. Simply put, the court found this conduct so antithetical to the purpose of warnings as to be unforeseeable. In contrast, in the present case TGA in no way either refused to follow warnings or removed safety protections, for Garrett and Phoenix neither gave such warnings nor provided such protections.
 
 
 67
 Accordingly, the issue of proximate cause was properly submitted to the jury and no basis appears for setting aside the jury's findings.
 
 
 68
 D. Miscellaneous Arguments Relating to Liability
 
 
 69
 Defendants' other challenges to so much of the judgment as holds them liable to Woodling do not warrant discussion. Garrett's arguments in support of a new trial are moot since Garrett urged such relief only if we upheld the contentions of TG and TGA that they were entitled to judgment as a matter of law. The arguments of TG and TGA that they are entitled to a new trial on grounds of trial error--such as their contention that, in connection with TG's alleged misrepresentations as to its control of TGA, the court should not have submitted to the jury an interrogatory asking who operated the Jetstar--are baseless.
 
 III. DAMAGES
 
 70
 Both sides contend that there was error in the calculation of the damages to which Woodling was entitled. Woodling contends principally that the trial judge erred in allowing the jury to deduct projected income taxes from its estimates of Albert Woodling's future earnings, in allowing the jury to use two percent as an after-inflation investment return rate in determining the present value of future lost earnings, and in failing to award prejudgment interest on future as well as past losses. TG and TGA contend that the court should have ordered Woodling to pay them interest on the $250,000, returned by Woodling in order to rescind the Release agreement, for the period during which she had the use of that money. Other defendants contend that the court erred in awarding prejudgment interest dating back to Albert Woodling's death on the total amount awarded for past losses although those losses were suffered at various times after his death. We find merit only in the contentions that the jury should not have been allowed to deduct income taxes from Albert Woodling's lost future earnings, that the court should not have awarded prejudgment interest on the undiscounted prejudgment losses for the entire prejudgment period dating back to Albert Woodling's death, and that Woodling should pay TG interest on the $250,000 for the period during which she had use of that money prior to her rescission of the Release agreement.
 
 A. The Deduction for Future Income Taxes
 
 71
 With respect to the amount Woodling was entitled to recover as lost support, the trial court admitted evidence as to the likely amount of income tax for which Albert Woodling would be liable on his anticipated gross earnings and instructed the jury that it should deduct such likely income taxes from Albert Woodling's gross income in calculating the amount to which Woodling was entitled for lost support. The evidentiary ruling and the instruction were erroneous.
 
 
 72
 Preliminarily, we note that an action for wrongful death is one created by state law and that state law controls the correct measure of damages for such a claim. E.g., Feldman v. Allegheny Airlines, Inc., 524 F.2d 384, 386 (2d Cir.1975) (state law governs, inter alia, reduction for likely future taxes and the discount rate adjusted for inflation to be used in discounting damages to present value); Rhea v. Massey-Ferguson, Inc., 767 F.2d 266, 270 (6th Cir.1985) (state law governs entitlement to prejudgment interest); Jarvis v. Johnson, 668 F.2d 740, 745-46 (3d Cir.1982) (same), Spinosa v. International Harvester Co., 621 F.2d 1154, 1158 (1st Cir.1980) (state law governs effect of income tax on lost earnings); 1A Moore's Federal Practice p 0.310, at 3139 (2d ed. 1985). Here, New York law governs the issues of what factors the jury should take into account in awarding damages.
 
 
 73
 In Vasina v. Grumman Corp., a wrongful death action, we held that New York law does not allow evidence on the effect of taxes on lost income. 644 F.2d at 118. We see no persuasive reason why Vasina should be overruled. A ruling of one panel of this Circuit on an issue of state law normally will not be reconsidered by another panel absent a subsequent decision of a state court or of this Circuit tending to cast doubt on that ruling. See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 261 (5th Cir.1980); Lee v. Frozen Food Express, Inc., 592 F.2d 271, 272 (5th Cir.1979); cf. Kremer v. Chemical Construction Corp., 623 F.2d 786, 788 (2d Cir.1980) (on issues of federal law, one panel will not overrule another absent an intervening Supreme Court or Second Circuit decision that casts doubt on the validity of the first panel's decision), aff'd on other grounds, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). Since Vasina, no decision of this Court has altered the rule established there, and two New York cases have accepted the proposition that taxes need not be deducted from lost income, see Sullivan v. Held, 81 A.D.2d 663, 665, 438 N.Y.S.2d 359, 361 (2d Dep't 1981); Louissaint v. Hudson Waterways Corp., 111 Misc.2d 122, 127-30, 443 N.Y.S.2d 678, 679-83 (Sup.Ct.N.Y.Co.1981), aff'd mem., 88 A.D.2d 1110, 452 N.Y.S.2d 472 (1st Dep't 1982). While we note that a contrary view was taken in Pellegrino v. State, 128 Misc.2d 757, 490 N.Y.S.2d 719, 720-21 (Ct.Cl.1985), aff'd on other issues, 121 A.D.2d 612, 503 N.Y.S.2d 865 (2d Dep't 1986), we regard this decision of a single trial judge of a court of limited jurisdiction as less persuasive than the decisions of the Appellate Division and New York Supreme Court in Sullivan and Louissaint.
 
 
 74
 In any event, we find no merit in defendants' argument that Vasina was wrongly decided because it read Coleman v. New York City Transit Authority, 37 N.Y.2d 137, 371 N.Y.S.2d 663, 332 N.E.2d 850 (1975), as barring not only jury instructions on the nontaxability of damages awards but also as barring evidence on the effect of taxes on lost income. Although the issue in Coleman was the instructions given to the jury, the Coleman court, in finding the instructions not erroneous, cited with approval a number of cases that addressed only the evidentiary issue, e.g., Petition of Marina Mercante Nicaraguense, S.A., 364 F.2d 118, 125-26 (2d Cir.1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967); McWeeney v. New York, N.H. & H. R.R. Co., 282 F.2d 34, 38-39 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960).
 
 
 75
 In sum, we conclude that the district court erred in allowing evidence on the effect of income taxes on Albert Woodling's anticipated future earnings and in instructing the jury to take such taxes into account in assessing damages.
 
 
 76
 The jury's consideration of social security taxes is governed by the same principles. Although the trial court did not instruct the jury that it should deduct social security taxes, the court did permit the introduction of evidence as to such taxes, and it denied Woodling's request that the jury be instructed not to consider such taxes. This evidence should have been excluded and the jury should not have considered this factor.
 
 
 77
 There was substantial dispute at trial as to both what proportion of his earnings Albert Woodling would have been able to use as support for his family and what his income tax liabilities on his earnings would have been. Since there was no special interrogatory to the jury revealing the amount the jury deducted for taxes, we cannot determine the extent to which the jury's $750,000 award for lost support ($150,000 for past, $600,000 for future) was affected by the improper consideration of income or social security taxes. Thus, this facet of the damage claim must be retried. However, since the jury answered interrogatories that distinguished between the amounts awarded for lost support and those awarded for loss of services and loss of fatherly care and guidance, there need be no new trial as to the amounts recoverable for lost services, care, and guidance. See Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 756 (2d Cir.1984).
 
 B. The Proper Discount Rate
 
 78
 At trial, Woodling's expert testified that the present value of an award of damages should be calculated by using a one percent discount rate. The trial court instructed the jury that it should determine what figure was appropriate and that the decisions of this Court had suggested that a 1 1/2 to 2 percent rate would be appropriate. Woodling contends that the instruction was error and that the jury should have been told to accept her expert's one-percent figure. We disagree.
 
 
 79
 On damages issues as on liability issues, the trier of fact need not accept expert testimony even if uncontradicted. See, e.g., Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627-28, 64 S.Ct. 724, 728-29, 88 L.Ed. 967 (1944); The Conqueror, 166 U.S. 110, 131-33, 17 S.Ct. 510, 518-19, 41 L.Ed. 937 (1897); Commercial Casualty Ins. Co. v. Roman, 269 N.Y. 451, 456-57, 199 N.E. 658 (1936). Thus, it was not error to refuse to instruct the jury that it must accept Woodling's expert's view.
 
 
 80
 Further, since the court clearly instructed the jury that it was free to determine what was the appropriate rate and to use that rate, it was not error to state that a 1 1/2 to 2 percent rate had been approved by this Court. See McCrann v. United States Lines, Inc., 803 F.2d 771, 775 (2d Cir.1986) (in cases governed by federal law, trier of fact applying "an adjusted discount rate [is] free to use 2% where the evidence of a more appropriate rate is unconvincing"); Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30, 34-40 (2d Cir.1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). It is clear that under New York law, in "computing damages for wrongful death or diminished earning capacity resulting from injury," lost future earnings are discounted, O'Brien v. O'Brien, 66 N.Y.2d 576, 588, 498 N.Y.S.2d 743, 749, 489 N.E.2d 712, 718 (1985); see Richards v. South Buffalo Ry Co., 54 A.D.2d 310, 314, 388 N.Y.S.2d 479, 482 (4th Dep't 1976); Zainovich v. American Airlines, Inc., 26 A.D.2d 155, 159, 271 N.Y.S.2d 866, 871 (1st Dep't 1966) (Breitel, J.); Greck v. New York Central R.R. Co., 21 A.D.2d 776, 777, 250 N.Y.S.2d 992, 993 (1st Dep't 1964) (reversing for failure to discount to present value), and though the New York Court of Appeals has not yet ruled what the discount rate as adjusted for inflation should be, we have seen no reason to expect that the state courts would use a rate lower than two percent, cf. Richards v. South Buffalo Ry. Co., 54 A.D.2d at 314, 388 N.Y.S.2d at 482 (using 4% discount rate). Thus, it was not error for the district court to allow use of the two-percent rate instead of the one-percent rate advocated by Woodling's expert.
 
 
 81
 We have considered plaintiff's other challenges to the discount rate instruction and find them to be without merit.
 
 
 82
 C. The Proper Computation of Prejudgment Interest
 
 
 83
 Both sides challenge the district court's calculation of prejudgment interest. The court awarded such interest on all of the sums awarded for prejudgment losses, for the entire prejudgment period dating back to Albert Woodling's death. Woodling urges affirmance of this award as far as it goes but contends that the court should have awarded her prejudgment interest on postjudgment losses as well. Defendants oppose this contention and argue further that, since the past losses were suffered at various times between the accident and the entry of judgment, the court should either have calculated prejudgment interest on each item of prejudgment loss only from the time of its occurrence, or have calculated interest on the sum of such losses from an intermediate date between the accident and the judgment. We find greater merit in defendants' arguments than in those of Woodling.
 
 1. Postjudgment Losses
 
 84
 EPTL Sec. 5-4.3 provides, in part, that "[i]nterest upon the principal sum recovered by the plaintiff from the date of the decedent's death shall be added to and be a part of the total sum awarded." Woodling contends that this provision required the district court to include in the judgment an award of interest on all of her losses, whether or not suffered prior to the entry of judgment. Defendants, on the other hand, argue that our decision in Lin v. McDonnell Douglas Corp., 742 F.2d 45, 51-52 (2d Cir.1984) ("Lin ") forbade the award of prejudgment interest for postjudgment losses. Although we are uncertain of the correctness of the fundamental assumption of Lin, we conclude that since the facts here matched that assumption the Lin holding should have been applied in the present case.
 
 
 85
 In Lin we ruled that a plaintiff was not entitled to prejudgment interest on postjudgment losses, stating that
 
 
 86
 [t]he purpose of the [wrongful death] statute is to compensate for " 'pecuniary injuries' suffered by the distributees of decedent's estate." Parilis v. Feinstein, 49 N.Y.2d 984, 985, 429 N.Y.S.2d 165, 406 N.E.2d 1059 (1980). The prejudgment interest provision implements this goal by ensuring that the distributees are compensated for the time value of the income stream the decedent would have earned between death and the entry of judgment.... Were prejudgment interest applied to the component of the award intended to compensate the plaintiff for postjudgment losses, plaintiffs would effectively receive a double recovery.
 
 
 87
 742 F.2d at 51-52. The assumption underlying this reasoning was that, when the factfinder discounts the award for future losses to account for the income that can be earned on an immediate lump sum award, it discounts back only as far as the date of its decision, not back to the date of the decedent's death. See id. at 51-52 & n. 8. If the award of damages for losses that have yet to occur is not discounted for that earlier period from the date of death to date of decision, then an award of interest for that earlier period would not compensate any loss but would give the plaintiff a windfall. Since the goal of the wrongful death statute is to compensate the decedent's distributees for their pecuniary loss, see EPTL Sec. 5-4.3; Parilis v. Feinstein, 49 N.Y.2d 984, 985, 429 N.Y.S.2d 165, 166, 406 N.E.2d 1059, 1060 (1980); Rosenfeld v. Isaacs, 79 A.D.2d 630, 630-31, 433 N.Y.S.2d 623, 624-25 (2d Dep't 1980), Lin 's view, i.e., that when the future loss award is discounted only to date of judgment there should be no prejudgment interest on those future losses, is correct. Cf. Hollwedel v. Duffy-Mott Co., 263 N.Y. 95, 103-07, 188 N.E. 266 (1933) (under former N.Y.Civ.Prac.Act Sec. 480, discharged employee cannot receive prejudgment interest on undiscounted lost wages from date of breach of contract as this would lead to overcompensation); Petition of City of New York, 332 F.2d 1006, 1008 (2d Cir.) (to the extent damage award already compensates for delay, there should be no prejudgment interest), cert. denied, 379 U.S. 922, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964).
 
 
 88
 Although we have found no clear discussion in the cases, it appears that the prior practice in wrongful death cases may have been to discount the plaintiff's postjudgment losses all the way back to the decedent's death, in which case, the award of prejudgment interest starting from the same date is needed to provide full compensation for the loss. See In re Petroleum Tankers Corp., 204 F.Supp. 727, 731-32, 735-36 (S.D.N.Y.1960); cf. Hollwedel v. Duffy-Mott Co., 263 N.Y. at 103-07. Assuming that the inflation-adjusted discount rate is based on the legal rate of interest, which is used in calculating prejudgment interest, this practice reaches precisely the same result as Lin. See In re Air Crash Disaster Near Chicago, Ill., 644 F.2d 633, 643-46 (7th Cir.1981).
 
 
 89
 We decline Woodling's invitation to abandon Lin on the basis that a recent New York Appellate Division decision, Soulier v. Hughes, 119 A.D.2d 951, 501 N.Y.S.2d 480 (3d Dep't 1986), has rejected it, since it is far from clear that Soulier achieves a result different from that in Lin. The terse statement in Soulier "declin[ing] to adopt [Lin 's] reasoning," id. at 954, 501 N.Y.S.2d at 482, was unaccompanied by a disclosure of the method of discounting used in that case or of that court's reasoning. If the Soulier postjudgment damage award was discounted to the date of the decedent's death, Soulier reaches the same result achieved by Lin. If the Soulier award was discounted only to the date of the judgment, the methodology does not appear to conform to New York practice, the result was a double recovery that does not conform to the compensatory goal of the EPTL, and the court has provided no reasoning as to why this was the proper result. In light of our inability to determine whether the methodology used was consistent with that envisioned by Lin, and in light of the absence of any reasoning in support of the result produced if the methodology used was inconsistent with Lin and apparently inconsistent with prior New York practice, we conclude that Soulier is an inappropriate basis on which to determine that Lin is inconsistent with New York law.
 
 
 90
 In the present case, since the jury was instructed to discount its award for future losses only back to the date of its decision, the court should not have awarded prejudgment interest on those losses.
 
 2. Prejudgment Losses
 
 91
 The purpose of a prejudgment interest award is to remedy the delay in compensating a plaintiff for a loss. To this end, CPLR Sec. 5001(b) provides that
 
 
 92
 [i]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.
 
 
 93
 This section applies to lost earnings recovered in tort suits. See Loeb v. Teitelbaum, 112 Misc.2d 1039, 1041, 448 N.Y.S.2d 391, 393 (N.Y.Civ.Ct.1982) (lost earnings recovered in tort suit for false arrest and malicious prosecution).
 
 
 94
 Since Woodling's cause of action for wrongful death accrued upon Albert Woodling's death, and Woodling's claim for lost support is derived from Albert Woodling's lost earnings over the years, Sec. 5001(b) was applicable to the recovery on the claim for prejudgment lost support. Section 5001(b) was also applicable to the recovery on the claims for past loss of fatherly care and guidance and past loss of services since under EPTL Sec. 5-4.3 these are claims for "pecuniary injuries." Such pecuniary injuries are in the nature of deprivations of property, see Estate of Gary, 79 Misc.2d 419, 420, 358 N.Y.S.2d 488, 490 (Surr.Ct. Nassau Co. 1974); N.Y. EPTL Sec. 5-4.3 Rohan's Practice Commentary, at 497 (McKinney 1981) (pecuniary injury is deprivation of pecuniary benefits that plaintiff had reasonable expectation of receiving), and CPLR Sec. 5001 applies to interest on claims for deprivation of property. See CPLR Sec. 5001(a); Mallis v. Bankers Trust Co., 717 F.2d 683, 694-95 (2d Cir.1983) (Sec. 5001 applies to tortious interference with tangible and intangible property rights). Accordingly, Sec. 5001(b) did not authorize the court to award prejudgment interest on the total amount of Woodling's prejudgment loss dating back to the date of Albert Woodling's death.
 
 
 95
 Section 5001(b) provides two methods for avoiding overcompensating the plaintiff when prejudgment losses have occurred over a period of time: interest may be computed from the various dates on which the losses occurred, or it may be computed on all prejudgment losses "from a single reasonable intermediate date." CPLR Sec. 5001(b); see Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., 804 F.2d 787, 796 (2d Cir.1986). On remand, the district court should recalculate the prejudgment interest on the awards for past loss of fatherly care and guidance and past loss of services in a manner consistent with one of these methods. Following a new trial with respect to the claim for lost support, required in Part III.A. above, the interest on an award for lost past support should also be calculated in like manner.
 
 
 96
 D. TG's Entitlement to Interest on the $250,000 Release Payment
 
 
 97
 Finally, we turn to TG's argument that in order to obtain rescission of the Release agreement, Woodling should have been required not only to return to TG the $250,000 she had received as consideration for signing the Release, but also to pay TG the legal rate of interest on that amount for the period during which she retained it. We find merit in the contention that Woodling should disgorge whatever interest she earned on the money, up to the legal rate of interest.
 
 
 98
 A plaintiff seeking rescission of a contract must disgorge "the fruits of the bargain." Pacelli Brothers Transportation, Inc. v. Pacelli, 456 A.2d at 330; see Kavarco v. T.J.E., Inc., 478 A.2d at 261 (party rescinding contract renounces "any property obtained pursuant to the contract" and rescission should place both parties "as nearly as possible, in the same position as existed just prior to execution of the contract"). Such "fruits" include benefits derived from possession of the property conveyed, see Duksa v. City of Middletown, 192 Conn. 191, 472 A.2d 1, 4, 7 (1984); Restatement (Second) of Contracts Sec. 384 comment a, such as interest on moneys conveyed, see Marr v. Tumulty, 256 N.Y. 15, 21-22, 26, 175 N.E. 356 (1931) (Cardozo, C.J.); Thomas v. Beals, 154 Mass. 51, 27 N.E. 1004, 1005 (1891) (Holmes, J.); Restatement (Second) of Restitution Sec. 29 (Tent. Draft No. 1, 1983), Restatement of Restitution Sec. 159(1)(a) (1937), or net profits from a conveyed business, see Vitale v. Coyne Realty, Inc., 66 A.D.2d 562, 564, 414 N.Y.S.2d 388, 390 (4th Dep't 1979).
 
 
 99
 As to the rate of interest that must be paid on a sum returned in order to obtain rescission, we have discovered no pertinent Connecticut decision. When rescission is based on misrepresentation, the general rule appears to be that the maker of the misrepresentation is entitled to recover no more than the legal rate of interest and that he must bear the risk that the person to whom the misrepresentation was made may have earned less than that rate of interest. See, e.g., Restatement of Restitution Sec. 159 illustration 1; Restatement (Second) of Restitution Sec. 29 comment a (Tent. Draft No. 1, 1983).
 
 
 100
 Accordingly, the district court should enter an order on remand requiring Woodling to pay TG interest on the $250,000 at the rate of interest she received or at Connecticut's legal rate, whichever is lower.
 
 CONCLUSION
 
 101
 The judgment of the district court is vacated insofar as it (1) awarded $750,000 in damages for past and future loss of support, (2) awarded prejudgment interest on all past losses dating back to the date of Albert Woodling's death, and (3) failed to require Woodling to pay TG interest on the sum received in consideration for executing the rescinded Release agreement. In all other respects the judgment is affirmed. The matter is remanded to the district court for (1) a new trial with respect to the amount of damages to which Woodling is entitled for past and future loss of support, (2) recalculation of prejudgment interest on all awards for prejudgment losses in a manner consistent with this opinion, and (3) an order requiring Woodling to pay interest to TG as described above.
 
 
 102
 Plaintiff shall recover her costs of these appeals from TG, TGA, Garrett, and Phoenix. All other parties shall bear their own costs.