Principal National Life Insurance Co. v. Coassin

# In the

# United States Court of Appeals

## For the Second Circuit

_____

August Term 2017

ARGUED: DECEMBER 14, 2017
DECIDED: MARCH 5, 2018

No. 16-2930-cv

_____

PRINCIPAL NATIONAL LIFE INSURANCE CO.,

*Plaintiff-Counter-Defendant-Appellant*,

*v.*

EMILY C. COASSIN, Trustee of the Lawrence P. Coassin
Irrevocable Trust dated 06/23/1999, THOMAS GIBNEY,

*Defendants-Counter-Claimants-Appellees*,

J.C. DAVID HADDEN, Trustee of the Lawrence P. Coassin Irrevocable
Trust dated 06/23/1999,

*Defendant.*

_____

Appeal from the United States District Court
for the District of Connecticut.
No. 13-cv-1520 – Janet Bond Arterton, *District Judge*.

_____

Before: CALABRESI, WESLEY, AND CHIN, *Circuit Judges*.

_____

Sara Anderson Frey, Gordon & Rees, LLP, Philadelphia, PA (Jay S. Blumenkopf, Gordon & Rees, LLP, New York, NY, *on brief*) *for Plaintiff-Counter-Defendant-Appellant*

David R. Schaefer**,** Brenner, Saltzman & Wallman, LLP, New Haven, CT (Michael T. Cretella, Brenner, Saltzman & Wallman, LLP, New Haven, CT, *on brief*) *for Defendants-Counter-Claimants-Appellees*

CALABRESI, *Circuit Judge*:

In this appeal from a bench trial, we must decide whether the District Court properly denied an insurance company's motion to rescind a life insurance policy on the basis of misrepresentations made by the deceased when applying for the policy. The District Court found that the deceased had made misrepresentations in his life insurance application. It concluded, however, that the deceased's misrepresentations were immaterial and denied the motion to rescind.

In reaching this result, the District Court relied on *Pinette v. Assurance Co. of America*, 52 F.3d 407 (2d Cir. 1995) ("*Pinette*") and *FDIC v. Great American Insurance Co.*, 607 F.3d 288 (2d Cir. 2010) ("*Great American Insurance Co.*"), our

2

most recent decisions on when, under Connecticut law, an insurer may rescind a policy because of an insured's misrepresentation.

No decision of a Connecticut court or of this Court calling *Pinette* or *Great American Insurance Co.* into question has been brought to our attention. Nor has any independent research revealed any cases missed by the parties. "A ruling of one panel of this Circuit on an issue of state law normally will not be reconsidered by another panel absent a subsequent decision of a state court or of this Circuit tending to cast doubt on that ruling." *Woodling v. Garrett Corp.*, 813 F.2d 543, 557 (2d Cir. 1987). Accordingly, the District Court correctly identified *Pinette* and *Great American Insurance Co.* as setting the controlling standards in this case. The District Court's findings of fact were not clearly erroneous. We see no error in its application of these facts to the controlling standards. We, therefore, affirm.

I.

On April 9, 2012, Lawrence Coassin submitted an application to Principal National Life Insurance Company ("Principal") for a $10,000,000 life insurance policy to replace an existing life insurance policy that he had had with another company. The application contained the following language:

2

> I represent that all statements in this application are true and complete to the best of my knowledge and belief and were correctly recorded before I signed my name below. I understand and agree that the statements in the application, including statements by the Proposed Insured in any medical questionnaire that becomes a part of this application, shall be the basis of any insurance issued. I also understand that misrepresentations can mean denial of an otherwise valid claim and rescission of the policy during the contestable period.

App. 958. On April 17, 2012, Principal issued Coassin the requested life insurance policy on the conditions that he complete, among other things, an Amendment to that Application and a Supplemental Statement of Health.

On April 25, 2012, Coassin completed the Amendment and revised his answer to question 18(j) of the original application. That question asked: "In the last ten years, have you had, been treated for or been diagnosed as having . . . any disease or disorder of the eyes, ears, nose, throat or skin?" App. 956. In the original application, he had answered "no." App. 956. In the Amendment, he answered, "[Y]es, earache with dizziness, lightheadedness and vertigo 12/11. Resolved completely without recurrence. No further MD visits needed." App. 949. The Amendment provided that "amendments to the Application listed above are part of the Application, and the Application and the amendments are to be taken as a whole." *Id*.

3

On the same day, he also completed the Supplemental Statement. He checked "No" to the question, "Have you had any illness or injury or consulted a member of the medical profession since the date of application?" App. 950. The Supplemental Statement likewise provided that "these statements will become part of my application and any policy issued on it." *Id*.

In filling out these forms, Coassin knowingly made misrepresentations to Principal. On April 17, 2012, Coassin had seen Dr. Ronald Hirokawa, an ear, nose, and throat specialist, to investigate his vertigo. At the visit, Dr. Hirokawa had arranged a) further tests and b) future appointments. All this was contrary to what Coassin had represented in the Amendment and the Supplemental Statement. Unaware of these falsehoods, Principal issued the life insurance plan at a standard rate.

Coassin followed up with three scheduled appointments. First, he sat for a standard hearing test, known as a basic audiological evaluation, and performed normally. Second, he underwent an auditory brainstem response evaluation ("ABR") and the audiologist reported that "[r]etrococlear pathology," a problem relating more closely to the brain than to the inner ear, "cannot be ruled out."

4

App. 968. Third, he received a videonystagmography ("VNG") and learned that there "is a sign of [a central nervous system] lesion." App. 967.

Because the ABR and the VNG produced abnormal results, Dr. Hirokawa recommended a magnetic resonance imaging ("MRI"). Coassin received an MRI and the radiologist noted that "[n]o abnormal mass is seen," App. 284, but that indications could "signal abnormality." App. 285. Dr. Hirokawa then suggested that Coassin "seek an evaluation or consultation with a neurologist." App. 286.

Coassin sent his MRI to Dr. Samuel Potolicchio, a neurologist who happened to be his brother-in-law, and Dr. Potolicchio told him in a conversation on the telephone that "[t]here was no structural lesion in the brain to suggest tumor." App. 332. Dr. Potolicchio explained Coassin's vertigo by noting that he "most likely had benign positional vertigo" and that "[t]here are exercises that [he] could do, there's specific therapy that can be done, and medications that could be used." App. 333. Significantly, he did not recommend further testing or evaluation.

In November 2012, an MRI with contrast revealed that Coassin had, in fact, developed a brain tumor. In July 2013, Coassin died. Later that year, Coassin's

wife, acting as a trustee of the Lawrence P. Coassin Irrevocable Trust dated 06/23/1999, submitted a claim for benefits under the policy.

Because Coassin died within two years of applying for his policy, Principal performed a contestability review "to provide an underwriting opinion as to what we would have done had all the true facts been known." App. 416. As part of this review, Principal investigated Coassin's application and discovered his misrepresentations. After consulting Principal's written guidelines, Principal concluded that, had it known the truth, it would have denied Coassin's application.

Principal then brought suit in the District of Connecticut for rescission of the policy and for a declaration that the Policy was void. Principal moved for summary judgment. The District Court held, as a matter of law, that Coassin had misrepresented information on his application. But, finding disputed questions of fact as to whether Coassin's misrepresentations qualified as material, it denied summary judgment in part.

After a bench trial, the District Court ruled in favor of Coassin. The Court observed, '"Under Connecticut law, an insurance policy maybe [sic] voided by the insurer if' the insurer 'prove[s] three elements: (1) a misrepresentation (or

untrue statement) by the [applicant] which was (2) knowingly made and (3) material to [the insurer's] decision whether to insure.'" *Principal Nat'l Life Ins. Co. v. Coassin*, 196 F. Supp. 3d 356 n.2 (D. Conn. 2016) (quoting *Pinette,* 52 F. 3d at 409) (second alteration added). To determine materiality, the District Court further explained, "[A]n answer to a question on an insurance application is presumptively material . . . , and an inquiry into whether the insurer would have issued the policy had the applicant been truthful on the application is therefore appropriate." *Id.* at 356 (internal quotation marks and citations omitted) (first alteration in original).

The District Court then found that, had Principal known the truth, it would have still issued the policy. And, on that basis, it held that the misrepresentations were not material.

According to the District Court, Principal follows written guidelines to determine whether or not to issue a policy. Those guidelines provide that Principal will issue a life insurance policy, even if a person has vertigo and the cause is unknown, if the vertigo has been fully investigated and the symptoms have continued for more than six months. Under Principal's interpretation of those guidelines, "fully investigated" requires that "there's no ongoing referrals,

recommendations to see additional physicians, [and] there's a definitive diagnosis." App. 690. On this basis, the District Court concluded that, after Dr. Potolicchio had reviewed Coassin's MRI, had diagnosed the vertigo as benign positional, and had recommended no further referrals, Principal would have issued a policy at the standard rate. Coassin's vertigo, which had continued for more than six months, had been fully investigated under Principal's guidelines as Principal interpreted them.

In coming to these conclusions, the District Court rejected Principal's three main arguments a) that the doctor related to the patient could not have fully investigated an illness, b) that the doctor could not have fully investigated an illness without making a written record, and c) that the doctor could not have fully investigated an illness without performing his own examinations of the patient. Principal timely appealed.

## II.

We hear this case in diversity jurisdiction. "Federal courts sitting in diversity cases will, of course, apply the substantive law of the forum State on outcome determinative issues." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994). "We . . . review *de novo* the district court's interpretation and

8

application of state law." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 199 (2d Cir. 2003). "The district court's findings of fact after a bench trial are not to be overturned unless they are clearly erroneous." *Ceraso v. Motiva Enter., LLC*, 326 F.3d 303, 316 (2d Cir. 2003). Given the applicable standards of review, we affirm.

First, we hold that the District Court correctly followed our previous interpretations of state law, which—in the absence of a subsequent state court or Second Circuit decision casting them into doubt—are generally to be treated as controlling. Second, while we might not have reached the same result, we conclude that the District Court did not clearly err in its factual findings.

A.

The District Court applied the correct legal standard. Under Connecticut law, an insurance policy may be voided by the insurer if the applicant made "[m]aterial representations . . . , relied on by the company, which were untrue and unknown [sic] by the assured to be untrue when made." *State Bank & Trust Co. v. Conn. Gen. Life Ins. Co.*, 145 A. 565, 567 (Conn. 1929). *See also Middlesex Mut. Assur. Co. v. Walsh*, 590 A.2d 957, 963 (Conn. 1991) (quoting *State Bank & Trust Co.*, 145 A. at 567, as holding that "[m]aterial representations . . . relied on by the

9

[insurance] company, which were untrue, and known by the assured to be untrue when made, invalidate the policy" (alterations in original)).  The case before us raises the further question of what makes a particular representation "material" under Connecticut law.  Four relevant cases, two state and two federal, speak to this question.

In the first state case, *Davis Scofield Co. v. Agricultural Insurance Co.*, Connecticut's highest court found that an insurance company could rescind a fire insurance policy because the applicant had failed to disclose information about an embezzling employee and his previous attempts to burn down the purportedly covered property.  145 A. 38, 40 (Conn. 1929).  In coming to this conclusion, the Supreme Court of Errors gave the following definition of materiality: "A fact is material to the consideration of a contract of insurance when, in the judgment of reasonably careful and intelligent persons, it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium."  *Id.*  Because a history of embezzlement and a previous arson attempt would influence a fire insurance policy's issuance, the Court of Errors concluded that these facts were material and that the insurance company could rescind the policy.

In the second state case, *State Bank & Trust Co.*, decided just a month after *Davis Scofield Co.*, the Court of Errors ruled on whether another representation was material. 145 A. at 566. In that case, an insurance company sought to rescind a life insurance policy after it discovered that the deceased had knowingly misrepresented his medical history on his life insurance application. *Id.* The deceased's beneficiary argued to the Court of Errors that "recovery is not barred by misrepresentations as to immaterial matters and the question of their materiality was one of fact for the jury . . . ." *Id.* The Court rejected this assertion and stated that it "is beyond question" that the facts "were material to the risk as [a] matter of law." *Id.*

In coming to this conclusion, the *State Bank & Trust Co.* Court wrote ambiguously. In some sentences, the Court of Errors seemed to diverge from its decision in *Davis Scofield Co.* It said that "[m]atters made the subject of special inquiry are deemed conclusively material" and that, "[w]here the representation is contained in an answer to a question contained in the application which is made a part of the policy, the inquiry and answer are tantamount to an agreement that the matter inquired about is material." *Id.*

11

In other sentences, however, the Court appears to have hewn closely to *Davis Scofield Co.*, explaining that "[t]he test of materiality is in the effect which the knowledge of the fact in question would have on the making of the contract." *Id.*

In two cases, our Court has harmonized *Davis Scofield Co.* and *State Bank & Trust Co.* by relying on what is common to both cases and by construing *State Banks & Trust Co.*'s seemingly inconsistent absolute rule into a presumption. In the first case, *Pinette,* an insurance company rescinded a fire insurance policy when it discovered that the applicants had inaccurately answered questions related to their loss history and a previously canceled policy. 52 F.3d at 409. We sided with the insurance company and held, "Under Connecticut law, a misrepresentation is material 'when, in the judgment of reasonably careful and intelligent persons, it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium.'" *Id.* at 411 (quoting *Davis Scofield Co.*, 145 A. at 40). We followed this with a less absolute articulation of *State Bank & Trust Co.*'s standard: "Furthermore, Connecticut caselaw strongly *suggests* that an answer to a

12

question on an insurance application is *presumptively* material." *Id*. (citing *State Bank & Trust Co.*, 145 A. at 566) (emphasis added).

Having established these standards, we found that the fire insurance applicants' misrepresentations qualified as material under either standard. With regard to the first standard, we wrote, "Common sense tells us that an applicant's prior loss history is material to a reasonable insurance company's decision whether to insure that applicant or determination of the premium." *Id*. With regard to the second standard, we explained, "Thus, in addition to the character of the information misrepresented, the fact that the application in this case specifically requested the information supports the district court's finding of materiality." *Id.*

In the second case, *Great American Insurance Co.*, we cited *State Bank & Trust Co.*'s rule but applied its more nuanced gloss. 607 F.3d at 295. After quoting *State Bank & Trust Co.*'s language that "[m]atters made the subject of special inquiry are deemed conclusively material," *id.*, we held, "As prior losses were the subject of specific inquiry, CBC's response is *presumptively* material." *Id*. (emphasis added). That is, we treated *Pinette*'s reading of *State Bank & Trust Co.* as the correct statement of Connecticut law.

In the case before us, the District Court properly relied on the *Pinette* rule as we applied it in *Great American Insurance Co.* "A ruling of one panel of this Circuit on an issue of state law normally will not be reconsidered by another panel absent a subsequent decision of a state court or of this Circuit tending to cast doubt on that ruling." *Woodling*, 813 F.2d at 557. We have not had any subsequent state court decisions or language in any circuit court opinions cited to us that cast doubt on our previous rulings. Nor have we been able to identify any such case ourselves. Principal cites only one state court case decided after *Great American Insurance Co.* and it cites that case, *Gordon v. Gordon*, 84 A.3d 923 (Con. App. Ct. 2014), for an unrelated point.[1] It follows that the District Court correctly relied on our decisions in *Pinette* and *Great American Insurance Co.* to identify the controlling standard of materiality under Connecticut law.

B.

The application of this standard to the facts of this case presents a closer question. But we conclude that the District Court did not clearly err in finding

---

[1] Principal cites two unpublished state court cases decided after *Pinette* but before *Great American Insurance Co.* These cases, *Sherman v. Prudential Insurance Co. of America*, No. CV990078688S, 2002 WL 467774 (Conn. Super. Ct. Mar. 6, 2002) and *La Teano v. Hartford Life Insurance Co.*, No. CV980580409S, 2000 WL 966371 (Conn. Super. Ct. June 23, 2000), do not indicate any tension between *Pinette* and *State Bank & Trust Co.*

that Coassin had rebutted the presumption of materiality by showing that Principal would have issued Coassin a policy, even if it had known of the concealed information.

Coassin made two related misrepresentations. First, he wrote in an amendment to his insurance policy application that his vertigo "was resolved without recurrence" and, "No further MD visits needed." App. 949. Second, he checked "No" in the Supplemental Statement to the question, "Have you had any illness or injury or consulted a member of the medical profession since the date of application?" App. 950.

Both representations were false. Coassin knew that he continued to experience vertigo and that he had scheduled additional doctors' appointments. Indeed, he had received a basic audiological evaluation, an ABR, and a VNG after the date of the original applications. And, when the ABR and VNG revealed a possible neurological abnormality, he consulted with a neurologist.

In the absence of Principal's guidelines, the District Court might well have had to conclude that the misrepresentations were material and that Principal would not have sold the policy at the standard price but for the false statements. But Principal had guidelines indicating when, in circumstances like these,

15

policies should issue nonetheless. And the District Court did not clearly err in finding that, under Principal's guidelines, Principal would have issued Coassin a policy even if it had known this hidden history. Documentary evidence introduced at trial supports the District Court's conclusion that, under its guidelines, Principal would issue a policy to a person with vertigo if the vertigo had been "fully investigated" and the symptoms had continued for more than six months. Moreover, according to Principal's own testimony, "fully investigated" requires that "there's no ongoing referrals, recommendations to see additional physicians, [and] there's a definitive diagnosis." App. 690.

In light of these facts, the District Court did not clearly err when it found that, when the neurologist a) had reviewed Coassin's MRI more than six months after his vertigo symptoms began, b) had recommended no further referrals, and c) had diagnosed Coassin as suffering from "benign positional vertigo," Coassin's vertigo had been "fully investigated," as those terms were defined by Principal itself. On that basis, the District Court concluded that, had Principal known the facts, it would nonetheless have issued a policy at the standard rate.

Principal seeks to refute this conclusion not so much by questioning the applicability of the guidelines as by questioning whether the guidelines were met

16

because of who the neurologist was and how he reached and reported his conclusions. Specifically, Principal argues that the credibility of Coassin's diagnosis was undermined by the facts that Coassin a) was diagnosed by his brother-in-law, b) was diagnosed without an in-person examination, and c) was informed of his diagnosis over the telephone.

The District Court found the first argument unpersuasive because it assumed that a family member would be more—not less—likely to discover a family member's illness. Whatever the merits of that assumption, we note that there was nothing in the guidelines suggesting that the diagnosing doctor could not be related to the applicant. The District Court dismissed the second argument because Principal's policies allow insurers to make issuance decisions based on oral conversations with doctors. The District Court cast the third argument aside because Dr. Potolicchio testified that he would have performed the exact tests that Dr. Hirokawa had ordered and no more. As a result, the District Court denied Principal's claim for rescission and declaratory judgment and ruled that Principal had breached its contract with Coassin by refusing to pay his claim.

In determining whether the District Court's rejection of Principal's "explanations" lay well within a bench trial decisionmaker's authority, it is important to emphasize that we review the District Court's decision under the deferential clear error standard. Pursuant to this standard, "we are not allowed to second-guess either the trial court's credibility assessments or its choice between permissible competing inferences." *Ceraso*, 326 F.3d at 316. Indeed, "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

In the absence of evidence to that effect, we cannot say, as a matter of law, that Principal's guidelines required that diagnosis and prognosis a) be made by a non-related physician or b) be in writing or c) be based on a personal examination of the applicant rather than on a full review of the relevant exams. Nor can we find clear error in the District Court's rejection of testimony suggesting that perhaps Principal would not have followed its guidelines and would have refused to insure Coassin, so to speak, on a hunch. In other words, we cannot say that the District Court clearly erred in finding that the facts found met the guidelines' requirements for the issuance of the insurance policy.

III.

Since the District Court applied Connecticut law correctly and did not clearly err in its findings of fact, we AFFIRM its judgment.